**Ray AGARD, Petitioner–Appellant,**

v.

**Leonard PORTUONDO, Superintendent of Fishkill Correctional Facility, Respondent–Appellee.**

No. 336, Docket 96–2281.

United States Court of Appeals, Second Circuit.

Argued Oct. 24, 1996.

Decided July 3, 1997.

Beverly Van Ness, New York City, for Petitioner–Appellant.

Ellen C. Abbot, Assistant District Attorney, Queens County, Kew Gardens, NY (Richard A. Brown, District Attorney, Steven J. Chananie and Robin A. Forshaw, Assistant District Attorneys, of counsel), for Respondent–Appellee.

Before: OAKES, VAN GRAAFEILAND, and WINTER, Circuit Judges.

OAKES, Senior Circuit Judge:

Appellant Ray Agard appeals from the denial of the writ of habeas corpus dated March 15, 1996, and entered March 21, 1996, in the United States District Court for the Eastern District of New York, Reena Raggi, *Judge.*

Petitioner was convicted on February 25, 1991, in the Supreme Court of the State of New York, Queens County, *Justice* Arthur J. Cooperman presiding, of first degree sodomy and two counts of third degree weapons possession. He was sentenced to concurrent terms of 10 to 20 years' and 3½ to 7 years' imprisonment. Following the December 20, 1993, dismissal of one of the weapons possession counts and affirmance on the other counts, *People v. Agard,* 199 A.D.2d 401, 402, 606 N.Y.S.2d 239, 240 (2d Dep't 1993), Agard's application for leave to appeal was denied, *Judge* Ciparick, *People v. Agard,* 83 N.Y.2d 868, 613 N.Y.S.2d 129, 635 N.E.2d 298 (1994). Agard then petitioned for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court denied the petition, rejecting Agard's claims that his Sixth and Fourteenth Amendment rights had been violated at trial, but granted him a certificate of probable cause, permitting him to pursue this appeal. Transcript of Civil Cause for Status Conference/Hearing at 23, *Agard v. Portundo (sic),* No. CV–95–2239 (E.D.N.Y. March 15, 1996) (hereafter "District Court Transcript"). Agard now appeals to this court, asserting that the trial court erred in 1) refusing to permit defense counsel to question the victim about her prior sexual history; 2) limiting Agard's expert's testimony regarding the amount of force required to sustain rectal trauma during anal sodomy; and 3) permitting the prosecution to imply in closing arguments that petitioner, by virtue of being present in the courtroom throughout trial, gained the unique opportunity to fabri-cate his testimony to meet the state's evidence. We find no error on the first point. The second ruling, while erroneous, does not constitute harmful or constitutional error. The trial court's ruling on the last point, however, infringes upon Agard's constitutional rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments, and constitutes harmful error. We therefore reverse the district court and remand.

## I

### Facts

Agard met Nessa Winder and Breda Keegan, the complainants in the criminal action, at a Manhattan bar and night club on Friday, April 27, 1990. Petitioner's testimony and that of his friend and defense witness Adolph Kiah largely—though not entirely—squares with the complainants' story about the events of the following weekend. The witnesses agree that Agard and Winder started a sexual relationship in the wee hours of Saturday morning; spent part of Saturday afternoon on the beach with Keegan and Agard's roommate Freddy; and returned to Agard's apartment for a nap, but stayed until morning. The People and petitioner, however, presented conflicting stories about the extent of that sexual relationship, as well as what occurred a week later on the morning of Sunday, May 6, 1990. The People alleged that the petitioner committed an assault and, using threats and violence, eight acts of rape and forcible sodomy against Winder. Agard, by contrast, testified that he and Winder woke up after a night out on the town, engaged in consensual vaginal intercourse and then fell back asleep for several hours, when upon reawakening a quarrel erupted over the lateness of the hour during which she scratched his lip and he struck her.

### A. The People's Case

The People's case consisted of testimony from police investigators, medical experts and Keegan and Winder. At the time of trial, Winder and Keegan were both twenty-three year old women, and friends of eight years. They each moved to the United States from Ireland in 1989, and soon be-

came roommates, sharing a Brooklyn apartment with two other people. On the evening of April 27th, Keegan and Winder went to the Cavacanum, a bar in lower Manhattan. Winder recalled Agard approaching the women and offering to buy them drinks. He was "friendly" and the three went together downstairs to the club's dance area. Agard later invited Winder back to his apartment and she accepted. As she recalled, they were getting along "very well." Before they departed, Agard gave Keegan the telephone number to his apartment so she could call to say she had made it home safely.

Agard shared the top floor of a house in Queens with three roommates. Their landlady occupied the ground-floor apartment. Winder was introduced to Agard's roommate Freddy. Agard, who had earlier remarked that he carried a gun when riding the subway, showed Winder an automatic handgun kept in his closet. They then watched "blue" movies depicting mainly anal intercourse. Winder recalled Agard "mentioning" anal intercourse and "motioning that way" later that night when the two had sex, but she told him that she was not "into it" and "just said no." Winder testified that they did not engage in anal intercourse on that day, but did engage in consensual vaginal and oral sex before falling asleep. In the morning, they had intercourse again.

After a trip to a beach on Staten Island with Freddy and Keegan, Agard and Winder returned to Agard's apartment where they spent the night. Winder testified that she awoke at midnight, hoping to return to the Cavacanum where she and Agard had planned to meet Keegan, but Keegan could not be reached by phone and Agard did not want to go out again. After Agard attempted to initiate sex, Winder explained that, because she was expecting a boyfriend from England, she felt "we shouldn't go on like this." Winder testified that they did not engage in sexual relations that night.

The following week Agard made several attempts to contact Keegan and Winder. He suggested that he have dinner on Thursday night with Keegan, whose job was located near Agard's, but Keegan was not home when he called her to arrange the date. On Saturday, Agard called the women several times to see if they wanted to meet again at the Cavacanum. After he said that he would not call again, the women called him and agreed to meet at the club.

The women arrived late and found Agard, who was "short" with them, and Freddy. The four drank and talked for several hours. Cocaine was also used by at least some members of the party, including Winder. Winder testified that she eventually became drunk and blacked out: the last thing she recalled from that evening was Agard's friend Kiah arriving and the group making plans to go to another club. Keegan testified that Winder, although drunk and tired, was still "walking and talking" even after the time of her memory lapse. Keegan explained that she, Winder, Agard, Freddy, and Kiah, along with two other women who needed a ride, left for the other club in Kiah's car. On the way, Winder sat on Agard's lap in the front seat, but was not physically affectionate because she was asleep.

Only the two women passengers were allowed into the second club which was closing up when the group arrived. The party of five moved on to a bar in another neighborhood where they continued to drink. Keegan recalls that Winder was asleep or falling asleep, and did not even drink her drink. Sometime between 4:00 and 4:30 in the morning, the party left the bar. Keegan recalls wanting to return to her apartment in Brooklyn with Winder, but at Agard's suggestion the group returned to his apartment.

Kiah and Freddy left to buy beer while Agard let the women into his apartment. They settled into Agard's bedroom. Keegan testified that Winder immediately fell asleep, fully-clothed, on Agard's bed. When Keegan indicated that she wanted to call a cab, Agard responded that "he had sent his friends for beer and the least [they] could do is stay to have a beer after he had gone to that amount of trouble." According to Keegan, Agard became verbally abusive and threatening. He called her "Gaelic," told her to get her "monkey ass out of the house," said "he was going to smash [her] face in," and ordered her to "shut the fuck up."

He then went over to a chest of drawers against the wall and took out a gun. After clicking a cartridge into the handle, Agard placed the gun against Keegan's head, saying, "I'm going to give you three seconds to shut up." Agard then put the gun back into the drawer and continued to "abuse" Keegan until Kiah and Freddy returned with beer. Agard, by Keegan's recollection, told them "to get the bitch out of the house or he was going to hurt her . . . ."

Keegan asked Agard to follow her into Freddy's room so they could discuss what was making him so mad. They moved into the other room where Agard continued to threaten her, saying that she would "never leave the house alive" and that she could go "if you (Keegan) give both my friends head." Agard continued to change his mind, ordering Keegan to leave and then telling her to stay in Freddy's room. Keegan pleaded to see Winder, but when she was allowed into the bedroom Winder could not be awakened. Returning to the kitchen, Keegan found Kiah preparing to leave. Although initially reluctant, Keegan eventually decided to leave with Kiah. As she headed out the door of Agard's apartment and down the stairs, Keegan brushed by Agard, who turned and grabbed her around the neck. Keegan screamed, and he let her go, cursing her for getting him in trouble with his landlady. Keegan testified that she told Kiah during the trip to Brooklyn that Agard had threatened her with a gun.

Keegan arrived home at about 6:00 in the morning and went to bed. At 9:00 a.m. she called Agard's apartment to speak with Winder, but he answered the phone and hung up. She did not try again until 1:00 p.m., at which time she was told Winder had left. Agard immediately called Keegan back to tell her how mad he was at her for having awakened his landlady, and to threaten her that he would call again in a few days to let her know whether they had "a major fucking problem."

Winder testified that she awoke at 9:30 a.m., wearing only her "vest,"[1] unable to remember how she got where she was, but in a rush to get home because she was expecting her English friend. She remembered

that at some point Agard had asked her for "a fuck" and she said "no." She asked Agard to call her a cab, then tried to do so herself. He put the phone down and began to "curse [her]," saying she was a "no good ten-cent whore" and that she had "planned this." He also "curs[ed]" Keegan, saying that she had awakened the landlady, and called the women "no good white trash."

Winder began to get dressed and Agard came up from behind her and slapped her in the face. He tried to back her against the wall, but she moved to the other side of the bed where he kicked her. He told her she had "two choices, either I [Winder] do things his way or I would like the other thing less." He then came over to her and "put his penis into her mouth" and pulled on her hair. She pulled away from him, saying she "couldn't do it anymore." Agard continued to insult Winder. When she repeated that she could not do what he wanted, he took his gun from the drawer and began "putting cartridges into it," at which point Winder said "okay" and allowed him to resume the oral sodomy.

Winder said that she "needed to go to the bathroom," and Agard permitted her to leave. After initially locking herself in, she fled the bathroom for Freddy's bedroom where she grabbed Freddy and begged him for help. She was able to bring Freddy with her into Agard's room, but Freddy left when ordered out. Recalling Agard's comment about the landlady, Winder screamed, causing him to punch her three times in the face. Agard continued the verbal threats, ordered Winder to leave, but told her to "make [him] come first." She "managed to scratch his lip," but could not see any injury her scratch may have produced. He threatened her first with a beer bottle, holding it above her head as if ready to strike. When she still refused to engage in sex, he retrieved the gun and put it to her head, saying "[t]his is goodbye." At this point, Winder agreed to comply with his demands.

She asked to return to the bathroom for a drink of water. He refused, but brought her a beer for her thirst. Agard went to the bathroom himself, and Winder again fled to

---

**1.** It is not clear from the record what Winder meant by "vest."

Freddy's bedroom. Petitioner followed her, picking her up off Freddy's bed and carrying her "by the head and by the hair" back to his own bedroom, where he threatened to kill her.

Agard raped and sodomized Winder while slapping her buttocks before allowing her to return to the bathroom. She returned to his bedroom without making further efforts to flee, and he committed additional acts of anal sodomy, oral sodomy, and rape. Winder feigned a seizure in an effort to escape, but as soon as she "resumed normality," he raped her again.

Finally, Agard's landlady called the apartment twice, allowing Winder an opportunity to dress. Agard then called a taxi to take her back to Brooklyn and escorted her downstairs, saying "[d]on't dare call the police" and threatening her if she did. Winder got into the cab, but did not go far because she had no money. The driver dropped her off down the street from Agard's apartment where she was eventually able to phone Keegan. Winder hid until Keegan came for her, and the two women went to the police station.

That afternoon Doctor Ardeshir Karimi examined Winder at Elmhurst Hospital. He did not see any abnormality or signs of trauma in Winder's vagina or anus. Dr. Karimi took samples for a Vitullo kit from Winder's mouth, vagina, and anus. Later testing by Detective Robert Lewis determined that only the vaginal sample was positive for spermatozoa.

The next day, May 7, 1990, Winder and Keegan found the following message on the answering machine in their shared apartment:

> You will know who this message is for. After careful consideration of this entire situation, it was my fault. I was a golden asshole. The only thing I can do is say I'm sorry and that's it. I'll never bother you again. Live safely and peacefully. Goodbye.

At trial both women identified Agard's voice on the tape.

On May 8, 1990, Detective Philip Giardina executed a search warrant at Agard's home where he recovered a .45 caliber automatic handgun and two magazines containing shells. After his arrest the same day, Agard first denied that he had a gun, then later admitted to having it but said it was not real, did not work, or belonged to a friend. As to the sex crimes, Agard did not equivocate: he stated that he had consensual sex with Winder, that they got into a fight, and that she scratched him and he "mushed her face."

### B. The Defense's Case

Agard corroborated much of the complainants' account about the first weekend after they met. His story, however, departed from Winder's in the following respects: he said that on their first night together, they engaged in consensual, anal intercourse, using lubricants, and that they engaged in consensual intercourse on Saturday night. Agard also testified that Winder found his gun in the closet when she borrowed his bathrobe, and that she tried on the holster.

The discrepancies between Agard's and the complainants' stories became pronounced with respect to the events of the second weekend. Agard testified that, during the drive to the second nightclub, Winder was not only awake but kissing and fondling him as she sat on his lap in the front seat of the car. He also recalled that Keegan had not wanted to return to his home in Queens, but that Winder had had no such reservations.

According to Agard, Keegan was "loud" about her desire to go home when the group arrived at his apartment in Queens. Agard testified that as he escorted his "agitated" guest out to Kiah's car, they passed his landlady who was "upset" about the noise Keegan was making. Agard returned to his room and went to sleep on his bed next to Winder. It was about 6:00 a.m.

Three hours later, Agard and Winder awoke, and, according to Agard, had voluntary vaginal sex before falling asleep again. He testified that they reawakened sometime between noon and 1:00 p.m., and that Winder was "upset," "kind of hyper," and concerned that her boyfriend was going to kill her. Trying to quiet her, he approached her from behind and took hold of her shoulders. She

turned and smacked him, taking hold of his lower lip and scratching him on the inside of his mouth. Reflexively, he used the palm of his open hand to push her away, "mush[ing]" her in the eye. When the cab he had already called arrived, he gave Winder $25 and sent her on her way. Although he was "annoyed" about the trouble the women had caused him with his landlady, he was not "angry." The following day he called to apologize "because [he] felt that [he] should not have mushed her in the face."

Kiah also testified for the defense, contradicting Keegan on several points: he recalled that Winder embraced and kissed Agard during the drive to the second club. He also remembered that she was talking and drinking with the others at the last bar, not asleep as Keegan recollected. He further said that Keegan never told him that Agard threatened her with a gun.

Nineteen counts against Agard were submitted to the jury, two concerning Keegan, fourteen associated with Winder. The remaining three counts were weapons charges. The jury acquitted Agard on all but two counts relating to the women: he was found guilty of one of the two anal sodomy counts, and of felony assault in which rape was the underlying felony. He was also convicted of two counts of third degree weapons possession. The trial court dismissed the assault conviction as repugnant to the rape acquittal, and one of the third degree weapons possessions convictions was reversed on appeal.

## II

### Issues

#### A. Limitation of Victim's Testimony

■ Agard's first assertion of constitutional error relates to the trial court's limitation of defense counsel's attempt to cross-examine Winder on whether she had ever engaged in anal intercourse with persons other than Agard. At a sidebar, the defense asserted that the testimony was not being sought for "promiscuity purposes or anything of that nature." The argument was that the prosecution had attempted to overcome the medical evidence showing no anal trauma, by eliciting on direct examination Winder's testimony that she did not struggle during the incident; this, Agard's counsel asserted, "opened the door" to sexual history testimony probative of what the medical record ought to reflect. The trial court ruled that the defense's inquiry about prior sexual history was forbidden by the state rules of evidence, and that any probative value was far exceeded by the prejudice. It also rejected the defense's suggestion that the testimony be allowed with a limiting instruction to the jury.

■ Agard claims that the trial court's ruling denied him the ability to present his defense, thereby violating his Sixth and Fourteenth Amendment rights to confrontation and to due process. See Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986); Williams v. Lord, 996 F.2d 1481, 1483 (2d Cir.1993); Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988). In assessing this claim, we note that a state may restrict a defendant's introduction of evidence without violating the constitutional right to present a defense so long as those restrictions are neither "arbitrary [n]or disproportionate to the purposes they are designed to serve." Rock v. Arkansas, 483 U.S. 44, 55–56, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987). See Washington v. Texas, 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18 L.Ed.2d 1019 (1967).

Rape shield statutes have been enacted by Congress and the majority of states. Fed. R.Evid. 412; Michigan v. Lucas, 500 U.S. 145, 146, 111 S.Ct. 1743, 1744, 114 L.Ed.2d 205 (1991). The New York law relied upon by the trial court bars, as a general rule, the use at trial of evidence of an alleged victim's prior sexual conduct with persons other than the defendant, but grants the court discretion to admit such evidence in the interest of justice. N.Y.Crim. Proc. Law § 60.42 (McKinney 1992). This discretionary power, however, must be exercised within the boundaries of the Sixth and Fourteenth Amendments.

Petitioner argues to this court that the questions he intended to ask Winder are not the kind that rape shield statutes such as New York's are intended to prevent. The

interrogation of Winder was, he asserts, not an attempt to harass her or soil her name with intrusive questions and innuendo about promiscuity. Nor did he wish to show that she had a propensity to consent to anal intercourse which was demonstrated by her past behavior. In this appeal, he avows that he sought a negative answer to his questions. Supposedly, had Winder answered that she had little or no experience with anal sodomy, her response would have strengthened the importance of the medical evidence showing no anal trauma. Furthermore, he points out that Winder already had admitted to meeting a man at a bar and going home with him to engage in sexual intercourse; that the prosecutor had said to the jury that the complainant was "sexually active"; and that Winder had testified that she told Agard that she was not "into" anal intercourse, thereby suggesting she was inexperienced with that activity but doing so without specificity. Petitioner would have us find that, because these details were before the jury, any further testimony about Winder's past could do little additional harm.

We disagree with petitioner that his counsel's questioning of Winder was obviously outside the usual application of the rape shield laws. Rape shield laws serve the broad purpose of protecting the victims of rape from harassment and embarrassment in court, and by doing so seek to lessen women's historical unwillingness to report these crimes. Yet they also serve a second purpose: they reinforce the trial judge's traditional power to keep inflammatory and distracting evidence from the jury. *See Sandoval v. Acevedo*, 996 F.2d 145, 148–49 (7th Cir.1993) (citing *Lucas*, 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205). In this respect, rape shield laws are an example of the court's traditional power to exclude evidence the prejudicial character of which far exceeds probative value. Evidence of past sexual conduct and particularly of, perhaps, more unusual activities such as anal intercourse, is likely to distract a jury from the contemporaneous evidence it is asked to consider. And as for the probative side of the equation, it is far from clear what bearing prior consensual experience with a particular sexual practice has on the probability of

trauma occurring during a subsequent non-consensual act. For this reason, we believe that this second purpose of rape shield laws is well-served by excluding defense counsel's proposed questions to Winder. We find that the New York rape shield law is a restriction that both facially and as applied in Agard's case was neither arbitrary nor "disproportionate to the purposes [it was] designed to serve," and therefore does not violate any constitutional prohibition.

Furthermore, we are not persuaded by Agard's assertion that the other purpose of the rape shield statutes is not at play. His argument is weakened by an inconsistency in his own position: he assertedly expected Winder to answer that she "never" or only "once or twice" engaged in this sexual activity. Pet. Br. at 44. But Agard himself testified that he and Winder engaged in anal intercourse on the weekend they met, a statement clearly conflicting with the answer the defense now claims it anticipated. If Winder testified that she had on previous occasions consented to anal intercourse with other partners, her testimony would have been precisely the kind of forbidden sexual "propensity" evidence supporting Agard's claim that the two had engaged in consensual sodomy on their first night together. While a negative answer could have provided some additional measure of support—however slight—for the defense's argument concerning the medical record, an affirmative answer could also have aided its cause. In light of this wrinkle in petitioner's position, we, like the district court, are "skeptical" that the defense truly sought the answer "never," and that it truly had no intent to embarrass Winder or lessen her credibility with the jury. Regardless of Winder's answer, her testimony would not have altered the ultimate verdict, and it carried a risk of distracting and prejudicing the jury. We therefore agree with the state and district courts that the trial court's ruling on this point was not erroneous.

## B. Limitation on Expert Testimony

■ Agard's second assertion of error relates to the trial court's limitation on the testimony of an expert witness for the de-

fense. Winder testified that, when she was forced to engage in sodomy, her anus was "sore" and she twice had to pull away from Agard due to pain. On cross-examination, the defense elicited the following testimony from Winder:

Q. I believe you also testified that during this incident you say that [Agard] forced his penis into your anus; is that correct?

A. Yes.

Q. And that was against your will; correct?

A. Yes.

Q. And in fact that hurt, made it sore?

A. Yes.

Q. And that it's your testimony that at some subsequent time [he] again forced his penis into your anus?

A. Yes. Forced—yes.

Q. And that hurt very much; correct?

A. Yes.

Later in the trial, the prosecution established that Winder did not struggle with Agard because "[she] knew it would be more painful" if she resisted.

The prosecution asked its expert witness, Dr. Karimi, questions about the probability of discernible trauma to the rectum as a result of anal penetration. When asked whether "if a woman during anal intercourse felt pain, does that mean you would see trauma," Karimi replied "[n]o." Asked to explain, he said that "for ... trauma you have to have moderate or severe force. If the force is less than moderate, there wouldn't be any trauma."

The defense countered with expert testimony from Dr. Jeffrey Gilbert, who had not examined Winder but had reviewed her medical records. Based on his experience of conducting "thousands" of pelvic examinations, he testified that there is "very often" visible evidence of injury to the rectum when individuals engage in voluntary anal intercourse. He further explained that "at times with the presence of lubrication the injuries are still present." On cross-examination, he adopted the prosecutor's term "sometimes" in the place of "very often," and also acknowledged that trauma is not necessarily the result of such activity.

Defense counsel also posed a number of hypothetical questions to Dr. Gilbert concerning the likelihood of trauma as a result of "forcible" anal intercourse "against the will" of the victim who felt pain and soreness. All were objected to and the objections sustained by the trial court. The defense argued that the questions were proper, because they comported with Winder's testimony on cross-examination that Agard "forced" his penis into her anus. The prosecution countered that the questions were not relevant to the case, because the victim alleged that threats—not physical force—were used by Agard to overcome her will. Or, in the prosecutor's own words, "[y]ou didn't ask your expert if there was no struggle would there be trauma." The court continued to sustain prosecution objections to any question containing the words "force" or "forcible" on both direct and redirect examination. On summation, the prosecution paraphrased both experts' testimony, "[Winder] told you she didn't struggle when he was inside of her.... Dr. Gilbert and Dr. Karimi told you that if there is no struggle, there is not always going to be trauma, and I ask you to rely on [their] testimony...." The defense moved for a mistrial based on improper curtailment of its examination, and continued to press its disagreement with the court's decision through the trial and to the Appellate Division, Second Department.

Our analysis of Agard's contention is aided by the express conclusion of the Appellate Division that curtailment of the defense's expert testimony was improper under New York law (though the court did hold the error to be harmless). *Agard*, 199 A.D.2d at 402–03, 606 N.Y.S.2d at 240–41 ("the hypothetical question posed to the defendant's expert was based on facts which were 'fairly inferable from the evidence,' which included indications of physical force as well as threats") (citing, *inter alia*, *Tarlowe v. Metropolitan Ski Slopes, Inc.*, 28 N.Y.2d 410, 414, 322 N.Y.S.2d 665, 667, 271 N.E.2d 515, 516 (1971)). We find that, while expert testimony is limited by the requirements of relevancy and by the trial court's traditional discretion to prevent prejudicial or confusing testimony, these considerations did not war-

rant keeping this important information from the jury.

The trial court's rulings demonstrate a concern over an ambiguity in the words "force" and "forcible." Both terms may be used to mean either physical compulsion or doing something against the will of another. In the latter instance, physical coercion may not be present; for example, as the prosecution alleged in this case, threats can be used to overcome the will of another. The prosecution was rightly concerned that the defense's questions to its expert could have led the jury to misunderstand exactly which meaning of the word "force" was intended. Indeed, as the Appellate Division noted, the mixed roles of threats and physical force were at issue in the trial, as Winder alleged acts of physical force, including a kick, punches and slaps on her buttocks during the anal penetration. *Agard,* 199 A.D.2d at 402, 606 N.Y.S.2d at 240.

We agree that the term "force" is ambiguous and potentially misleading. However, that ambiguity was not a reason to exclude the expert testimony entirely, at least when the degree of force exercised by the defendant was at issue in the trial. Rather, it was a proper subject for the prosecutor's cross-examination of Dr. Gilbert. The prosecution could have brought out the fact that Winder did not struggle with Agard, and asked what effect that fact would have on Gilbert's opinion.

Moreover, the defense was not permitted to ask certain questions which to some extent clarified the meaning of the term "force" and which further used specific language taken from Winder's testimony. For example, defense counsel asked:

> Now, could you tell us within a reasonable degree of medical certainty what sort of findings you would expect if a woman claimed to have ... forcible anal intercourse against her will, the second time longer than the first, both times being sore and both times being painful?

These additional details gave the defense's interrogation further grounding in complainant's testimony, thereby making those questions even more clearly relevant. We therefore find error in the trial court's ruling.

Our question, however, is whether the ruling, viewed in light of the whole record, deprived Agard of a fundamentally fair trial. *Rosario,* 839 F.2d at 925. As we outlined in our discussion of the rape shield statute, the Sixth and Fourteenth Amendments to our Constitution guarantee a criminal defendant a meaningful opportunity to present a defense. *Crane,* 476 U.S. at 690, 106 S.Ct. at 2146. Erroneous evidentiary rulings rarely rise to the level of harm to this fundamental constitutional right. To isolate those few situations where such mistakes injure constitutional rights, this court applies the standard of "materiality" as set forth by the Supreme Court in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). *See Rosario,* 839 F.2d at 924; *Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir.1983). *Agurs* stated:

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Agurs,* 427 U.S. at 112–13, 96 S.Ct. at 2401–02 (footnotes omitted).

In order to evaluate the importance of the additional expert testimony in this case, therefore, we must look at the strength of the evidence supporting Agard's conviction.

■ On direct review, the Appellate Division characterized the evidence of his guilt as "overwhelming." Having reviewed the entire record of the trial, we cannot agree with that characterization, nor are we required to accept it on habeas review. *Annunziato v.*

*Manson,* 566 F.2d 410, 413 (2d Cir.1977). We believe that the lack of medical evidence on the one charge—forcible anal sodomy—for which the jury convicted Agard suggests that the jury decided the case primarily, if not solely, upon the credibility of Agard, Winder, and Keegan. We simply do not know the reasoning behind the verdict.[2] We do know, however, that, as the district court duly noted, Winder and Agard presented sharply conflicting stories making their credibility the central issue in the trial;[3] that there was very little evidence beyond the medical findings presented to the jury to support or undermine the testimony of the two most important witnesses; and that the jury's verdict does not demonstrate any clear resolution of the credibility question. In

2. Undoubtedly, the verdict was mixed and therefore somewhat confusing. Indeed, during a discussion of the charges to be given to the jury, the trial court commented, "you know, are they going to believe the sodomy counts and not a rape count? I mean it doesn't make any sense." Yet the verdict is not necessarily the result of a jury compromise. The jury could have credited large parts of Winder's testimony about the events of Saturday night and Sunday morning, but nonetheless concluded that, even despite the threats and violence she described, she did not express her unwillingness to engage in oral sex or vaginal intercourse with sufficient clarity to make Agard guilty of those crimes. The jury could also have believed her testimony that anal penetration occurred. It could further have believed that she was unwilling to engage in anal intercourse, and that Agard knew as much from their conversation the previous weekend. If the jury believed this testimony, it would explain the anal sodomy conviction as well as the acquittals on the charges of rape and forcible oral sodomy. Alternatively, of course, the numerous acquittals may indicate that the jury did not believe most of Winder's and Keegan's testimony. In any event, credibility was clearly the primary issue.

3. Even the State agrees that credibility was the main issue at trial:

Defense counsel, in his summation, argued vigorously that the prosecution's witnesses had fabricated the allegations against petitioner, and that petitioner's testimony was more credible than the testimony of the prosecution's witnesses. He asked the jury to compare the victim's testimony with petitioner's testimony, and to "consider the reasonableness of the two different stories." Defense counsel also argued that petitioner's description of the events of May 6, 1990, was a "more reasonable and natural extension of the relationship that started the weekend before," and described petitioner's testimony as "consistent."

light of these observations, we think that the evidence of Agard's guilt cannot be characterized as "overwhelming." We thus reject this basis for the conclusion of the Appellate Division that the error was harmless.

■ The Appellate Division also stated, however, that it found the erroneous evidentiary ruling to be harmless because "the defendant's expert was permitted to testify that individuals who engaged in voluntary anal intercourse, even using lubricants, frequently suffered from conspicuous rectal trauma." *Agard,* 199 A.D.2d at 403, 606 N.Y.S.2d at 241. We agree that this opinion evidence allowed Agard to make an argument about the significance of the lack of medical evidence of sodomy, and thereby saved the er-

In response, the prosecutor argued that Winder had been victimized by petitioner even though petitioner wanted the jury to think that he was the victim. She asked the jury to consider that petitioner, rather that (sic) the victim, was the person who had been less than straightforward because he was an interested witness. Further, the prosecutor pointed to the fact that petitioner had had the opportunity to hear all of the testimony in the case before he testified. These comments fairly responded to defense counsel's statements that the victim lied, and were therefore proper.

State's Br. at 46–47 (citations to record omitted). Likewise, the district court stated:

.... This was a credibility decision for the jury. And I read very carefully the testimony of both the defendant and the victim and there is no question in my mind that this court could not hope, on a cold record, to make credibility determinations between the people. That would not be my task in any event. But in some 'cases it's easier to get a sense for where the credibility problems were or were not. This is a much more difficult case.

. . .

I also recognize that the jury did acquit on a number of counts and that it is really only on this issue relating to the anal intercourse that a guilty verdict was returned and I think it is appropriate to look at this carefully. But I will say, parenthetically, that while it is not relevant to my consideration of constitutional deprivations, when a jury returns a mixed verdict such as this, one has to assume that it too looked at the evidence quite carefully. It didn't simply discount all of the people's testimony and reject it, or discount everything that the defendant said and throw it out and simply return a wholesale verdict; it wrestled with this. That is why there were four days of deliberation.

District Court Transcript at 14–15.

roneous ruling from rising to the level of constitutional harm because it did not deprive him of the opportunity to make an argument to the jury. Indeed, the facts of *Agurs* support this conclusion. The Court there concluded that the jury's ignorance of the victim's criminal record was not material to the defendant's self-defense defense, in part because evidence was already on record of the victim's propensity for violence, and thus the record was "largely cumulative." *Agurs,* 427 U.S. at 114, 96 S.Ct. at 2402. Here, too, additional opinion testimony would only add further support for a defense argument clearly before the jury.

### C. Prosecutor's Summation Remarks

■ Agard's third and final assertion of error on appeal is that his rights to confront the witnesses against him and to have a fair trial were violated by the prosecutor's closing remarks. In her summation, the prosecutor referred to Agard as "the one who had an answer for everything" and stated that "[a] lot of what he told you corroborates what the complaining witnesses told you. The only thing that doesn't is the denials of the crimes. Everything else fits perfectly." At the end of summation, she stated:

> You know, ladies and gentlemen, unlike all the other witnesses ... the defendant has a benefit and the benefit that he has, unlike all the other witnesses, is he gets to sit here and listen to the testimony of all the other witnesses before he testifies.

[objection overruled]

> That gives you a big advantage, doesn't it. You get to sit here and think what am I going to say and how am I going to say it? How am I going to fit it into the evidence?

[objection overruled]

> He's a smart man. I never said he was stupid.... He used everything to his advantage.

Petitioner's counsel later moved for a mistrial based on these remarks, stating that "comment[s] on Agard's presence at the trial [were improper]. He has the absolute constitutional right to be here.... It is improper to make comments to the jury that they should not believe him due to his exercise of his constitutional rights to be present at his trial." In denying that motion, the trial court judge responded that "[t]he fact that the defendant was present and heard all the testimony is something that may fairly be commented on. That has nothing to do with his right to remain silent. That he was the last witness in the case as (sic) a matter of fact." On Agard's direct appeal of his conviction, the Appellate Division stated simply that it found his argument on this point to be meritless. *Agard,* 199 A.D.2d at 403, 606 N.Y.S.2d at 241.

On habeas review, the district court stated that it was "troubled by" these comments, as they came "dangerously close to commenting on the exercise of a [constitutional] right." District Court Transcript at 21, 22. The court ultimately determined, however, that the remarks were not so prejudicial as to warrant habeas relief.[4]

### 1. Constitutional Error Analysis

Although ·we have unearthed no federal case which examines this issue, numerous state courts have addressed it. The highest courts· in Connecticut, Maine, the District of Columbia, Vermont, and Massachusetts, along with the Court of Appeals of Washington State, have agreed that such prosecutorial commentary is improper. *State v. Cassidy,* 236 Conn. 112, 672 A.2d 899, 905–08

---

4. We are not certain whether the district court reached this conclusion because it was unsure that error had occurred in the first place, or because it was unsure whether that error was harmful. *Compare* District Court Transcript at 22 ("erroneous comment in this case, *if it was erroneous,* did deal with a constitutional right.") (emphasis added) *with id.* ( "... I recognize that this was also a close case. But I am not satisfied that the petitioner has demonstrated

that he suffered any actual prejudice from this remark. I have read the entire summations of both counsel and in context I cannot say that I have any question in my mind ·... that there was any prejudice here or that I may have any concern that this may have swayed the verdict.") *See also id.* at 23 ("I really don't think, looked at in context, that this comment, however close I think it is to the line, would warrant habeas relief.")

(1996); *State v. Jones,* 580 A.2d 161, 162–63 (Me.1990) (prosecutor's comment was improper but defendant failed to preserve issue for appeal); *Coreas v. United States,* 565 A.2d 594, 604 (D.C.Ct.App.1989); *State v. Hemingway,* 148 Vt. 90, 528 A.2d 746, 747–48 (1987); *Commonwealth v. Person,* 400 Mass. 136, 508 N.E.2d 88, 90–91 (1987); *Dyson v. United States,* 418 A.2d 127, 131 (D.C.Ct. App.1980); `State v. Johnson,* 80 Wash.App. 337, 908 P.2d 900, 902–03 (1996). *See also, Commonwealth v. Elberry,* 38 Mass.App.Ct. 912, 645 N.E.2d 41, 42–43 (1995) (although comments constituted error, they were immediately cured by trial court); *Jenkins v. United States,* 374 A.2d 581, 583–84 (D.C.Ct. App.1977). On the other hand, the Supreme Court of Michigan and the intermediate appellate courts of Minnesota, New Jersey, and Texas have held otherwise. *See People v. Buckey,* 424 Mich. 1, 378 N.W.2d 432, 436–39 (1985) (disagreeing with *People v. Smith,* 73 Mich.App. 463, 252 N.W.2d 488, 492 (1977) (comments, though ultimately harmless, were "inadvisable") and *People v. Fredericks,* 125 Mich.App. 114, 335 N.W.2d 919, 921–22 (1983) (remarks seriously prejudiced defendant's case, which depended upon his own testimony)); *State v. Grilli,* 369 N.W.2d 35, 37 (Minn.Ct.App.1985); *State v. Robinson,* 157 N.J.Super. 118, 384 A.2d 569, 569–70 (App.Div.1978). These courts have addressed prosecutorial summation arguments virtually identical to the one made in *Agard.*[5]

Other state courts have addressed similar comments of prosecutors during cross-examination of the defendant. Although many of the state cases rely upon and make reference to summation cases and cross-examination cases as though they were analytically interchangeable, we believe that they should be addressed separately because summation remarks raise constitutional issues which either are not present or are of less concern when made upon cross-examination.[6] We today express no opinion as to the propriety or constitutionality of similar remarks made during cross-examination.[7] We hold only

---

**5.** *Buckey, Grilli,* and *Robinson* rejected the argument that the Sixth Amendment was violated by a prosecutor's commenting upon the defendant's unique opportunity for testimonial fabrication. In *Grilli,* the prosecutor had made this type of comment both during cross-examination and upon closing, thereby clouding the issue. Furthermore, defense counsel failed to object to the prosecutor's comments at either stage, thus waiving the defendant's right to review. It is therefore unclear to us exactly how much weight to assign to that court's exceedingly brief dismissal of the issue. *See Grilli,* 369 N.W.2d at 37 ("The prosecutor's cross-examination was not improper. The prosecutor was free to argue and attack appellant's credibility. Also, appellant failed to make any objection and waived his right to review of this issue. Similarly, the closing argument was not improper nor was any objection made to it." (citations and new paragraph omitted)). *Robinson* likewise briefly dismissed the issue, and also confused the question by discussing it as though it had arisen upon cross-examination even though it was actually made during summation:

It is well settled that when a defendant waives his right to remain silent and takes the stand in his own defense, he thereby subjects himself to cross-examination as to the credibility of his story. And that issue would involve whether the story had been fabricated. Here the issue of defendant's credibility was whether his testimony was tailored to that of the testimony of other witnesses, a perfectly proper inquiry.

*Robinson,* 384 A.2d at 570 (citations omitted). We therefore place little weight on the arguments

raised by these cases, and center more upon those made in *Buckey,* though we do note that all three cases base their holding upon the principle that the prosecutor may properly argue the defendant's lack of credibility.

**6.** On cross-examination, a prosecutor may legitimately question any witness about his opportunity and motivation to fabricate testimony. Such questioning goes to the witness' credibility, and the witness is afforded an opportunity to respond and repair the attack. Summation remarks, however, occur too late for the witness to rehabilitate his credibility and may, as in this case, occur too late for even his attorney to respond to the attack. *But see Sherrod v. United States,* 478 A.2d 644, 654 (D.C.Ct.App.1984) ("This court has indicated it is impermissible for the prosecutor to comment in closing argument on appellant's exercise of his Sixth Amendment right to confront witnesses. Accomplishing the same result by cross-examination is no less objectionable, since the prosecutor thereby can also seek to have the jury draw impermissible inferences from appellant's exercise of his constitutional right to confront witnesses." *Id.* (citations omitted)).

**7.** In keeping with this decision, we do not (with one exception) address herein those cases which assessed similar comments made during cross-examination. We do note, however, that the D.C. Court of Appeals ruled it unconstitutional for a prosecutor to make such comments even upon cross-examination, *Sherrod,* 478 A.2d at 654, in contrast with several other courts which

that it is constitutional error for a prosecutor to insinuate to the jury for the first time during summation that the defendant's presence in the courtroom at trial provided him with a unique opportunity to tailor his testimony to match the evidence. Such comments violate a criminal defendant's right to confrontation, his right to testify on his own behalf, and his right to receive due process and a fair trial.

### a. Defendant's Right to Confrontation

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. Amend. VI. This right applies to state as well as federal prosecutions via the due process clause of the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). "One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial." *Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970) (citing *Lewis v. United States,* 146 U.S. 370, 372, 13 S.Ct. 136, 137, 36 L.Ed. 1011 (1892)).

We find that a prosecutor's summation remarks noting the defendant's unique opportunity to be present at trial infringe upon that constitutionally guaranteed right. The remarks invite the jury to consider the defendant's exercise of his right to confrontation as evidence of guilt, and therefore penalize him for exercising that right. The comments, which imply that a truthful defendant would have stayed out of the courtroom before testifying or would have testified be-fore other evidence was presented,[8] force defendants either to forgo the right to be present at trial, forgo their Fifth Amendment right to testify on their own behalf, or risk the jury's suspicion. The Sixth Amendment does not permit those comments.

The remarks are analogous to the tactic of suggesting to juries that guilt can be implied from a defendant's decision to exercise his Fifth Amendment right *not* to testify, a tactic which has been held unconstitutional. In *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Supreme Court explained:

> [C]omment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,' which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly. It is said, however, that the inference of guilt for failure to testify as to facts peculiarly within the accused's knowledge is in any event natural and irresistible, and that comment on the failure does not magnify that inference into a penalty for asserting a constitutional privilege. What the jury may infer, given no help from the court, is one thing. What it may infer when the court solemnizes the silence of the accused into evidence against him is quite another.

*Id.* at 614, 85 S.Ct. at 1232–33 (citations and footnote omitted). The *Griffin* Court recognized that such commentary effectively penalizes the defendant for exercising his Fifth Amendment rights, and held it unconstitutional to require defendants to choose be-

---

held that a defendant who takes the stand subjects himself to cross-examination as to credibility. *State v. Smith,* 82 Wash.App. 327, 917 P.2d 1108, 1111–12 (1996) (no Sixth Amendment violation); *State v. Hoxsie,* 101 N.M. 7, 677 P.2d 620, 622 (1984), *overruled on other grounds by Gallegos v. Citizens Ins. Agency,* 108 N.M. 722, 779 P.2d 99 (1989) (same); *State v. Martin,* 101 N.M. 595, 686 P.2d 937, 941 (1984) (no Fifth Amendment violation); *People v. Sims,* 648 N.Y.S.2d 542 (1st Dep't 1996) (no Fifth or Sixth Amendment violation).

The exception to our general omission of cross-examination cases may be found in note 12, *infra,* and accompanying text, discussing and distinguishing *Smith* on other grounds.

8. This not only implicates the right to be present at trial, but also the right to testify. *Cf. Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972) (statute which required a defendant to testify, if at all, prior to presentation of any other defense testimony, violated defendant's Fifth Amendment right against self-incrimination as well as Fourteenth Amendment right to due process). Other aspects of the infringement on the right to testify are discussed in Part II.C.2., *infra.*

tween their rights.[9] We believe that *Griffin* principles are appropriately applied to the case at bar.

We therefore hold that the Sixth Amendment right to confrontation prohibits a prosecutor from commenting in summation that a defendant's testimony may be viewed in light of his presence in the courtroom during trial, because such comments violate the defendant's right to be present at trial. The Supreme Court has indicated that Sixth Amendment rights may at times be overcome by an important state interest. *Maryland v. Craig*, 497 U.S. 836, 850, 110 S.Ct. 3157, 3166, 111 L.Ed.2d 666 (1990) ("[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured."). *See also, Davis v. Alaska*, 415 U.S. 308, 319–20, 94 S.Ct. 1105, 1111–12, 39 L.Ed.2d 347 (1974). We thus look to whether important reasons sufficient to justify the infringement upon the defendant's right to be present at trial existed here.

The State presents the argument made by the Michigan Supreme Court that such commentary is not improper because it is a fair attack upon a witness's credibility. The *Buckey* court reasoned that "[o]pportunity and motive to fabricate testimony are permissible areas of inquiry of any witness," *Buckey*, 378 N.W.2d at 439,[10] and stated that "the argument is perfectly proper comment on credibility." *Id.*[11] *See also, Grilli*, 369 N.W.2d at 37 ("[t]he prosecutor was free to argue and attack appellant's credibility.") We next assess whether the prosecutor's need to attack a testifying defendant's credibility is an important reason justifying an infringement of his right to be present at trial.

9. We have carefully considered and found distinguishable the Court's earlier holding in *Raffel v. United States*, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926). *Raffel* held that the Fifth Amendment is not violated when a defendant who testifies in his own defense is impeached with his pre-arrest silence. *See also Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). The *Raffel* Court reasoned that, once a defendant takes the stand in his own defense, he is subject to cross-examination on the topic of his pre-arrest silence. As we have already stated, issues raised on cross-examination may implicate constitutional rights less strongly than those raised only in summation. *Raffel* therefore is less on point than *Griffin*. It is also unclear whether *Raffel* principles remain good law. *See Grunewald v. United States*, 353 U.S. 391, 425–26, 77 S.Ct. 963, 984–85, 1 L.Ed.2d 931 (1957) (Black, *J.*, concurring) (questioning whether *Raffel* survives *Johnson v. United States*, 318 U.S. 189, 196–99, 63 S.Ct. 549, 553–54, 87 L.Ed. 704 (1943)); *see also Jenkins*, 447 U.S. at 245 n. 10, 100 S.Ct. at 2133 n. 10 (Stevens, *J.*, concurring) (questioning whether *Raffel* survives *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976)); *United States v. Hale*, 422 U.S. 171, 175 n. 4, 95 S.Ct. 2133, 2136 n. 4, 45 L.Ed.2d 99 (1975) (declining to decide whether *Raffel* survives *Johnson* and *Griffin*.)

10. Even *Buckey*, however, conceded that "a prosecutor may, [not] in every case, argue that a defendant who has testified has fabricated his testimony merely because he has sat through his trial and heard the evidence. Thus, it cannot be said that every defendant will be faced with a choice between forfeiting one right so that he may exercise another—e.g., being present at trial, but not testifying so as to avoid the risk of prosecutorial comment that he fabricated testimony." *Buckey*, 378 N.W.2d at 439. Because, however, the court believed that the evidence in that case did support the prosecutor's inference of perjury, it deemed the remark to be a proper commentary upon credibility.

11. The court further stated: "To accept defendants' argument that they must choose between exercising their right to be present at trial and some other right would be to say that a defendant has the right to fabricate or conform testimony without comment." *Buckey*, 378 N.W.2d at 439. We disagree. Federal law unequivocally provides that a criminal defendant has no right to perjure himself in his own defense, *Harris v. New York*, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971), and that his attorney may not knowingly permit him to testify falsely, *Nix v. Whiteside*, 475 U.S. 157, 173, 106 S.Ct. 988, 997, 89 L.Ed.2d 123 (1986). Nothing in our holding is counter to this principle. It would be somewhat more accurate to say that our holding maintains the *opportunity* of a defendant to fabricate or conform testimony without comment, an opportunity granted by the Fifth and Sixth Amendments. For that matter, the very existence of the Fifth Amendment and its guarantee that a defendant may testify on his own behalf presents the opportunity of perjury; nevertheless, countervailing principles of criminal justice mandate that we not accept every opportunity to completely eliminate that risk. We decline to restrict a defendant's constitutional rights in order to prevent hypothetical perjury.

We take as the starting point of our analysis the distinction expressed by the Washington State Court of Appeals between a prosecutor's argument that a defendant has tailored his testimony to meet the state's evidence, and her argument that a defendant, by virtue of being present in the courtroom during trial, has gained an opportunity, unavailable to any other witness in the trial, to tailor his testimony to meet the evidence. *Compare Johnson,* 908 P.2d at 902 (state may not argue that, by virtue of attending trial, defendant has gained unique opportunity to tailor his or her testimony) *with State v. Smith,* 82 Wash.App. 327, 917 P.2d 1108, 1111–12 (1996) (state may argue that defendant has tailored his or her testimony to state's proof). The remarks made in *Smith* may be permissible commentary upon the defendant's credibility as a witness, while those made in *Johnson,* centering upon his unique opportunity to fabricate testimony as the only witness able to personally hear all the evidence previously presented to the jury, are not permissible because they amount to nothing more than an attack upon the exercise of rights the Constitution grants criminal defendants.[12] Agard's prosecutor made remarks similar to those in *Johnson,* so we limit our discussion to such comments and do not reach the *Smith*-like remarks.

This distinction, as well as that made above between cross-examination questions and summation comments, is relevant to whether the need to dispute the defendant's credibility is so important as to overcome his right to confrontation. In the light of these distinctions, we think that the asserted need to comment upon Agard's credibility carries little weight on these facts. It is perfectly proper for a prosecutor to cross-examine a defendant about those portions of his testimony which have indicia of fabrication. When, however, a prosecutor raises the specter of fabrication 1) for the first time on summation; 2) without facts in evidence to support the inference; or 3) in a manner which directly attacks the defendant's right to be present during his entire trial, our alarm bells begin to ring. When all three circumstances are present, the bells become shrill sirens. Such commentary is not proper comment upon credibility. Lawyers may not raise innuendo relating to bias or credibility from the shadows of unlitigated facts for the first time in their closing arguments. Such tactics prevent rebuttal and cross-examination, which are the engines of the truth-finding process in an adversarial criminal trial. Without facts in evidence to support an inference of fabrication, such remarks are prejudicial and not at all probative. They certainly do not provide an important reason for us to cut back on a defendant's exercise of his Sixth Amendment rights.

Our holding does not jeopardize the state's opportunity to attack credibility. If a prosecutor's concern about the defendant's credibility is legitimate, she has readily available alternate means of questioning him. For example, she is free to cross-examine him about discrepancies between his pre-trial account of events and his testimonial account. Having introduced this evidence, she may then remark upon those discrepancies during her summation.[13] She is also free, of course, to point out that he has motive to lie in order to escape incarceration (as Agard's prosecutor in fact did), and to remark upon that motive in summation (as she also did). Only those comments which specifically target and cast suspicion upon the defendant's unique Sixth Amendment right to be present at his trial and hear all testimony are forbidden by the Constitution; those remarks are not sim-

---

**12.** Although the Washington Court of Appeals centered upon this point as the critical distinction between *Johnson* and *Smith, Smith,* 82 Wash.App. 327, 917 P.2d at 1112, we note a second important distinction: *Johnson* evaluated summation remarks while *Smith* examined cross-examination comments.

**13.** As mentioned above, however, we are not here stating that it is constitutional for a prosecutor to question the defendant during cross-examination about his unique ability to be present at

trial, nor are we stating that she may avoid constitutional problems in summation by first raising the issue of fabrication or presence at trial during cross-examination. These factual circumstances are not before us. We only note that, if the defendant's credibility is truly the point which the state wants to raise with the jury, it is possible to raise that issue on both cross and summation without implicating constitutional rights.

ple commentary upon credibility, nor are they necessary to a prosecutor's argument that the defendant lacks credibility, if that argument has a basis in fact and not only in innuendo.[14]

We therefore hold that the prosecutor's summation remarks violated Agard's Sixth Amendment right to confrontation.[15]

### b. Right to Testify On One's Own Behalf

The Constitution provides a criminal defendant with an implicit right to testify in his own defense. *United States v. Dunnigan,* 507 U.S. 87, 96, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993); *Rock,* 483 U.S. at 49, 107 S.Ct. at 2708. That right springs from the Fourteenth Amendment's Due Process Clause, the Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor," U.S. Const. Amend. VI, and is also a "necessary corollary" of the Fifth Amendment's guarantee against compelled testimony.[16] *Rock,* 483 U.S. at 51–53, 107 S.Ct. at 2708–10.

As noted in the discussion of the defendant's right to be present at trial, the Supreme Court has already held that commentary which chills the defendant's right to testify on his own behalf is unconstitutional. *Griffin,* 380 U.S. at 615, 85 S. Ct. at 1233. The remarks made by the prosecution here have a similar chilling effect upon the same right by forcing the defendant to choose between having his testimony viewed without unfair comment or exercising his constitutional rights to testify and to be present at trial. We therefore hold that these summation comments violate a defendant's right to testify on his own behalf and correspondingly the Fifth, Sixth and Fourteenth Amendments.

### c. Right to Due Process of Law

In addition to providing a path for the Fifth and Sixth Amendments to attach to state prosecutions, the Fourteenth Amendment guarantees a state criminal defendant due process of law,[17] including a fair trial. In determining whether prosecutorial misconduct during summation amounts to a violation of the Fourteenth Amendment, the Supreme Court has stated that "[t]he rele-

---

**14.** The dissent asserts that this right is not "unique" because "[d]efendants are present in courtrooms all across the country every working day." The unique right of which we speak, however, is not some right unique to Agard himself, but rather the right to be present at trial, which is a right granted by the Constitution only to criminal defendants and to no other trial witnesses or parties.

**15.** Whether, as our dissenting colleague asserts, the jurors expect a defendant to be present in court by virtue of "plain common-sense, not the Sixth Amendment," is beside the point. Jurors may draw innumerable conclusions with regard to a defendant's presence, just as they may draw them with regard to a defendant's failure to testify, and there is nothing judges can do about it other than instruct them as to the applicable law. *Cf. Griffin,* 380 U.S. at 614, 85 S.Ct. at 1232–33. But the Supreme Court has stopped prosecutors from emphasizing the latter fact and implying some wrongdoing from the exercise of these constitutional rights, and we are able to do the same as to the former fact. And this we will do.

It is certainly true that defendants are present in courtrooms every day. We hope it is not true that prosecutors in courtrooms all across the country are every day commenting upon a crimi-

nal defendant's presence at his own trial as though that presence were a license to lie. We intend to ensure that there is never a day on which they are free so to comment within our jurisdiction.

**16.** "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Although Agard has not relied upon the Fifth Amendment in his appeal to us, we raise the argument *sua sponte* in order to emphasize the entire framework of this right as set out in the Constitution.

> The interrelationship of the enumerated rights is significant.... The Bill cannot be construed merely taxonomically, as a set of pigeonholes or preconceived rules into which a given factual situation does or does not fit. Rather it must be viewed as a whole; it is an interlocking complex of basic principles of fairness and individual entitlement that carries a continuing meaning applicable to entirely different or changed circumstances.

James L. Oakes, *The Proper Role of the Federal Courts In Enforcing the Bill of Rights,* 54 N.Y.U. L.Rev. 911, 922 (1979).

**17.** "No State shall ... deprive any person of life, liberty, or property, without due process of law...." U.S. Const. Amend. XIV.

vant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *Gonzalez v. Sullivan,* 934 F.2d 419, 424 (2d Cir.1991). *See also, United States ex rel. Haynes v. McKendrick,* 481 F.2d 152 (2d Cir.1973) (racially biased summation remarks violated due process rights of defendant). We have previously held that "[w]e must examine the remarks in the context of the entire trial to determine whether the prosecutor's behavior amounted to prejudicial error. In determining whether there is prejudicial error we look at three factors: the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." *Strouse v. Leonardo,* 928 F.2d 548, 557 (2d Cir.1991); *see Bentley v. Scully,* 41 F.3d 818, 824 (2d Cir.1994), *cert. denied,* — U.S. —, 116 S.Ct. 1029, 134 L.Ed.2d 107 (1996).

■ In assessing whether Agard's right to due process has been violated, then, we first examine the severity of the prosecutor's misconduct. The State argues that the comments were "brief and isolated" and therefore not severe. *See Bentley,* 41 F.3d at 825. Yet, the length of the commentary is not automatically decisive. As the late Judge Frank once said, "[improper prosecutorial summation] remarks [have not been deemed] harmless because compressed into a single sentence, for experience teaches that a poisonous suggestion of that kind needs no elaboration." *United States v. Antonelli Fireworks Co.,* 155 F.2d 631, 646 (2d Cir.1946) (Frank, *J.* dissenting) (footnote omitted). A comment which directly disparages the defendant's exercise of constitutional rights can be severe misconduct regardless of its length. More important to due process analysis are the nature and effect of the remarks. Under other circumstances, a prosecutor's closing commentary upon a witness' opportunity to fabricate testimony might only implicate state evidentiary law; when the witness

in question is the defendant, however, and the commentary goes to the heart of the constitutionally guaranteed rights to be present at trial and testify on one's own behalf, the very fairness of the entire trial is compromised.[18]

Moving on with the three-step analysis, we note that the trial court took no curative measures to correct the prosecutor's error (an unsurprising result, given that he did not find her comments to be erroneous). Though it is true that the judge instructed the jury that the lawyer's comments were not evidence and that the jury's recollections of events should control, *see* Charge at 827, this is a standard jury instruction and was not specifically directed at curing the error nor was it made at the time of the prosecutor's improper remarks.

Finally, we are not at all certain that Agard would have been convicted had the error not occurred. As we have already discussed, credibility was unquestionably the central issue at trial. The fact that the jury convicted only on anal sodomy and not on vaginal rape or oral sodomy indicates that it might have had trouble believing all of Winder's testimony; perhaps, without the prosecutor's summation comments, it would have believed Agard in the entirety. We cannot be certain. Our three-step test therefore indicates that the prosecutor's remarks, unchallenged by the trial judge, did deny Agard a fair trial.

Viewing these comments in the context of the entire trial, we also recognize that prosecutorial commentary which tramples upon a defendant's constitutional rights has been held to implicate the entire fairness of a trial more than non-constitutional error. When rejecting the defendant's due process claim in *Darden,* the Supreme Court stated that "the prosecutors' argument did not manipulate or misstate the evidence, *nor did it implicate other specific rights of the accused* such as the right to counsel or the right to remain silent." *Darden,* 477 U.S. at 181–82, 106 S.Ct. at 2471–72 (emphasis added). In contrast, Agard's specific rights to testify on his own behalf, to compulsory process, and to

18. *See* discussion *infra* regarding *Darden,* 477     U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144.

confront the witnesses against him were all implicated by the comments we are reviewing. The entire fairness of his trial, and thereby due process, were likewise infringed. We therefore find that Agard's Fourteenth Amendment right to due process of law was violated by the trial court's error.

### 2. Harmless Error Review

Having determined that the trial court committed error by permitting the prosecutor's improper summation in violation of Agard's constitutional rights, we now consider whether that error was so harmful as to warrant a grant of Agard's petition for habeas corpus.

### a. Standard of Review

In evaluating an application for the writ of habeas corpus, we apply the standard of review enunciated in *Brecht v. Abrahamson*.[19] In *Brecht*, the Court held that a conviction may be set aside on collateral habeas review only if the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson*, 507 U.S. 619, 637–38, 113 S.Ct. 1710, 1721–22, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).[20] If, however, "grave doubt" exists as to the harmfulness of the error, it must be resolved in favor of the habeas petitioner. *O'Neal v. McAninch*, 513 U.S. 432, 437, 115 S.Ct. 992, 995–96, 130 L.Ed.2d 947 (1995) ("By 'grave doubt' we mean that, in the judge's mind, the matter is so evenly bal-

anced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* at 435, 115 S.Ct. at 994.).

### b. Application of Standard of Review

■ Upon evaluating the trial court's error under the *Brecht/Kotteakos* standard, we are certain that it was harmful. As noted in Part II.B., *supra*, credibility was the primary issue in Agard's trial, and was what the jury must have assessed most carefully. As to this particular issue, Agard's attorney reiterated on oral argument before the district court:

> ... the remarks that I am complaining about that the prosecutor made on summation relates (sic) again to the main issue in the case, which is credibility. We have the defendant testifying, which is not typical. And [the prosecutor] makes a big point out of saying to the jury: this is a big advantage this guy got; he got to sit here and listen to all of our witnesses and the luxury of then trying to figure out the best way to get around the damaging testimony they had. So it did implicate his constitutional rights.
>
> But, again, on the question of prejudice, you know, anything that would cast any unfair suspicion on his credibility in this kind of case has to be considered harmful.... It is definitely related to the main theme of this case, which is: who should you believe?

District Court Transcript at 13–14. The prosecutor's improper summation comments directly and negatively affected Agard's

---

**19.** The Court has recently underlined the differentiation to which it alluded in *Brecht* and *Arizona v. Fulminante*, 499 U.S. 279, 307–08, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991) between "trial error" and "structural error." *See California v. Roy,* —— U.S. ——, ——, 117 S.Ct. 337, 338–39, 136 L.Ed.2d 266 (1996). "Structural error" is that which is so fundamental that harmless error review is inappropriate, *Roy,* —— U.S. at ——, 117 S.Ct. at 338, while "trial error" is that "which occurred during the presentation of the case to the jury." *Fulminante*, 499 U.S. at 307, 111 S.Ct. at 1264. The trial court's permitting of improper prosecutorial comments is "trial error" and thus is the proper subject of our review for harmless error.

**20.** Prior to *Brecht*, the standard of review for use by federal courts on collateral habeas review was

that enunciated in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), which held that a conviction tainted by constitutional error must be reversed unless the reviewing court could "declare a belief that [the trial error] was harmless beyond a reasonable doubt." Although we have recently commented that *Chapman* review may occasionally remain appropriate even upon collateral review, *Lyons v. Johnson*, 99 F.3d 499, 503 (2d Cir.1996), that issue is not before us on appeal. Moreover, it is no more determinative of the matter at bar than it was in *Lyons*, because the trial court's error was harmful regardless of which standard is applied. We therefore proceed with *Brecht/Kotteakos* analysis.

credibility, and could single-handedly have been the reason for the jury's decision to believe, contrary to the available medical evidence, Winder's testimony that she was anally sodomized rather than Agard's denial that anal intercourse had taken place that weekend. We therefore find that the error meets the *Brecht/Kotteakos* standard of harmfulness in that it had a substantial and injurious effect on the jury's verdict.

### Conclusion

The prosecutor's improper summation remarks violated numerous constitutional rights guaranteed to state criminal defendants, and were so prejudicial to Agard as to be considered harmful error. We therefore reverse the district court's denial of the writ of habeas corpus. The case is remanded to that court with directions to enter a revised judgment ordering Agard's release after he has served his sentence on the weapons possession conviction, unless the state affords him a new trial within sixty days from the issuance of our mandate. Our mandate shall issue forthwith.

WINTER, Circuit Judge, concurring in the result:

I concur in the result although on somewhat different grounds from those expressed in Judge Oakes's opinion.

With regard to the limitation on appellant's cross examination of Winder, appellant has not shown that any of the various answers that might have been given to the questions at issue would have enhanced his defense in any material respect. In particular, he laid no foundation to show that the questions might shed light on his arguments concerning the lack of physical evidence of trauma.

With regard to the limitation on the testimony of the defense expert, the question seems close only because of hindsight. We now know of the unusual verdict rendered. In light of that verdict, the ambiguities regarding the use of the words "force" and "forcible" now seem obvious, and the limiting of the cross-examination was an event of considerable magnitude. But it is not error, much less constitutional error, to sustain objections to ambiguous questions.

With regard to the prosecutor's comments on summation, I agree with Judge Oakes that they implicated appellant's rights to be present at trial and to testify. I would, however, expressly limit our holding to the following circumstances.

First, the only evidence supporting the inference that appellant tailored his testimony to the prosecution's case was his presence in the courtroom and that testimony itself. There was, for example, nothing in the record indicating that appellant had earlier given a different version of events and altered that version after learning of the prosecution's evidence. The only support for the inference, therefore, was appellant's exercise of constitutional rights.

Second, the inference suggested by the prosecutor was entirely unfair in that appellant had no chance to anticipate and rebut it by testimony. Under New York law, absent a claim of recent fabrication, appellant could not have introduced evidence of prior consistent statements—that is, evidence that he had told the same story even before witnessing the prosecution's case. *See People v. McDaniel,* 81 N.Y.2d 10, 16, 595 N.Y.S.2d 364, 611 N.E.2d 265 (1993); *People v. McClean,* 69 N.Y.2d 426, 428, 515 N.Y.S.2d 428, 508 N.E.2d 140 (1987). So long as New York prohibits criminal defendants from introducing prior consistent statements to demonstrate that their version of evidence was not fabricated after learning of the prosecution's evidence, its prosecutors may not, in my view, argue that such fabrication occurred.

Third, the prosecutor's argument was not harmless. The case turned on detailed and conflicting versions of several events given by prosecution witnesses and by the defendant. The prosecution witnesses were present only for their individual testimony while the defendant was present for the entire trial.[1] The accusation that appellant heard

---

1. We may assume for purposes of this matter that our dissenting colleague is correct in concluding that jurors generally expect a criminal defendant to be present in the courtroom during the trial and that remarking upon that presence merely states the obvious. However, the prose-

the prosecution's case and tailored his testimony to it was, therefore, a powerful argument. It affected none of the witnesses against him, and, as noted, was virtually impossible to rebut directly. The only effective way for appellant to have avoided this unfair but powerful argument would have been either to forego presence at the trial or testifying in his own defense—important constitutional rights.

I therefore concur in the result.

VAN GRAAFEILAND, Circuit Judge, dissenting:

In February 1991, Ray Agard sat in a Queens County courtroom with a jury for ten days while the State of New York prosecuted him for a number of sex-related crimes. Nessa Winder and Breda Keegan were the complaining witnesses. A grand jury had indicted Agard on two counts with respect to Keegan's claims and fourteen counts with respect to Winder's. Three additional counts dealt with the unlawful possession of a revolver. After four days of deliberation, the jury acquitted Agard on both counts involving Keegan and on all the sex abuse counts involving Winder except a count of anal sodomy and a count of assault associated with one of the rape claims, which the trial court subsequently dismissed as repugnant to Agard's acquittal on the pertinent rape claim. The jury convicted Agard on two counts of unlawful possession, but one of the counts was dismissed by the court as duplicitous.

On the appeal of Agard's conviction, the Appellate Division, Second Department, stated that there was "overwhelming evidence of the defendant's guilt" and that the evidence "was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." 199 A.D.2d 401, 402, 606 N.Y.S.2d 239 (1993), *leave to appeal denied*, 83 N.Y.2d 868, 613 N.Y.S.2d 129, 635 N.E.2d 298 (1994). The Court found "no merit" in the arguments

that my colleagues herein advance. Frankly, I don't find any either.

Perhaps a good starting point for my expressions of disagreement with my colleagues is to restate the limited authority that a federal court has in reviewing a petition for habeas corpus relief based upon an asserted state court error. This is described in *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), as follows:

> The Court of Appeals in this case noted, as petitioner urged, that its review was "the narrow one of due process, and not the broad exercise of supervisory power that [it] would possess in regard to [its] own trial court." We regard this observation as important for not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a "failure to observe that fundamental fairness essential to the very concept of justice." *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941).

*Id.* at 642, 94 S.Ct. at 1871 (footnote omitted).

It is in the light of these words that we should view *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), which my colleagues treat as a guiding star for the grant of relief herein. The case of *United States v. Hasting*, 461 U.S. 499, 508–09, 103 S.Ct. 1974, 1980–91, 76 L.Ed.2d 96 (1983), sets forth the correct weight to be accorded *Griffin*:

> Soon after *Griffin*, however, this Court decided *Chapman v. California*, which involved prosecutorial comment on the defendant's failure to testify in a trial that had been conducted in California before *Griffin* was decided. The question was whether a *Griffin* error was *per se* error requiring automatic reversal or whether the conviction could be affirmed if the re-

cutor's comments here went far beyond remarking upon Agard's presence. They specifically emphasized that other witnesses were not present to hear each others' testimony and that the defendant therefore had a "big advantage" in being able "to sit here and think what I am going to say and .... [h]ow am I going to fit it into the evidence?" I doubt that many jurors are familiar with the practice of excluding witnesses except for their individual testimony. Indeed, courtroom scenes on television or in the movies may require the presence of the important characters for dramatic effect. In my view, therefore, the prosecutor's remarks explored matters far beyond the obvious and had a telling effect.

viewing court concluded that, on the whole record, the error was harmless beyond a reasonable doubt. In *Chapman* this Court affirmatively rejected a *per se* rule.

After examining the harmless-error rules of the 50 States along with the federal analog, 28 U.S.C. § 2111, the *Chapman* Court stated:

"All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. *We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless,* not requiring the automatic reversal of the conviction." 386 U.S., at 22, 87 S.Ct. at 827 (emphasis added).

In holding that the harmless-error rule governs even constitutional violations under some circumstances, the Court recognized that, given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial. *Brown v. United States,* 411 U.S. 223, 231–232, 93 S.Ct. 1565, 1570–1571, 36 L.Ed.2d 208 (1973), citing *Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968); cf. *Engle v. Isaac,* 456 U.S. 107, 133–134, 102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783 (1982). *Chapman* reflected the concern, later noted by Chief Justice Roger Traynor of the Supreme Court of California, that when courts fashion rules whose violations mandate automatic reversals, they "retrea[t] from their responsibility, becoming instead 'impregnable citadels of technicality.'" R. Traynor, The Riddle of Harmless Error 14 (1970)(quoting Kavanagh, Improvement of Administration of Criminal Justice by Exercise of Judicial Power, 11 A.B.A.J. 217, 222 (1925)) (footnote omitted).

I suggest that the following two excerpts from my colleagues' opinions may very well qualify as "impregnable citadels of technicality."

So long as New York prohibits criminal defendants from introducing prior consistent statements to demonstrate that their version of evidence was not fabricated after learning of the prosecution's evidence, its prosecutors may not, in my view, argue that such fabrication occurred.

Winter op. at 2.

It is certainly true that defendants are present in courtrooms every day. We hope it is not true that prosecutors in courtrooms all across the country are every day commenting upon a criminal defendant's presence at his own trial as though that presence were a license to lie. We intend to ensure that there is never a day on which they are free so to comment within our jurisdiction.

Oakes op. at 40 n. 15.

The issue that should be determinative in every case is whether the petitioner had a fair trial. *Malley v. Manson,* 547 F.2d 25, 28 (2d Cir.1976), *cert. denied,* 430 U.S. 918, 97 S.Ct. 1335, 51 L.Ed.2d 598 (1977).

Although both judges and laymen agree that litigants are entitled to a fair trial, they are mistaken if they believe that the concept of fairness had its origin in the United States Constitution. Fairness was recognized as a matter of plain common sense long before the Constitution came into existence. The right of a defendant to be heard has been called one of the "first principles of the social compact and of the right administration of justice," *McVeigh v. United States,* 78 U.S. (11 Wall.) 259, 267, 20 L.Ed. 80 (1870), "a principle of natural justice, recognized as such by the common intelligence and conscience of all nations," *Windsor v. McVeigh,* 93 U.S. 274, 277, 23 L.Ed. 914 (1876). A Latin phrase, the English translation of which is "[h]e who determines any matter without hearing both sides, though he may have decided right, has not done justice," is attributed to the Roman philosopher, Seneca, who lived some seventeen centuries before the Constitution was written.

A similar principle with "ancient roots" is the right of a defendant to be present in court to confront and cross-examine prosecution witnesses. *See Goldberg v. Kelly,* 397 U.S. 254, 270, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970). The defendant's presence "is fundamental to the basic legitimacy of the criminal process," *United States v. Washington,* 705 F.2d 489, 497 (D.C.Cir.1983) (per curiam), and is required by the "dictates of humanity," *Lewis v. United States,* 146 U.S. 370, 372, 13 S.Ct. 136, 137, 36 L.Ed. 1011 (1892) (internal quotation marks omitted). Indeed, so strong is the defendant's right to be present that, for a time, the Supreme Court held that it could not be waived. *See id.* at 373–74, 13 S.Ct. at 137–38; *Hopt v. Utah,* 110 U.S. 574, 579, 4 S.Ct. 202, 204, 28 L.Ed. 262 (1884). The right to be present has been said to be "scarcely less important to the accused than the right of trial itself." *Diaz v. United States,* 223 U.S. 442, 455, 32 S.Ct. 250, 254, 56 L.Ed. 500 (1912). "The very substance of the defendant's right is to be present. By hypothesis it is unfair to exclude him." *Snyder v. Massachusetts,* 291 U.S. 97, 136–37, 54 S.Ct. 330, 343, 78 L.Ed. 674 (1934) (Roberts, J., dissenting); *see also Greene v. McElroy,* 360 U.S. 474, 496–97, 79 S.Ct. 1400, 1413–14, 3 L.Ed.2d 1377 (1959).

Today, in both the New York and the federal courts, a defendant not only has the right to be present throughout the trial, he has the duty to be present, subject only to certain limited exceptions. *See* Fed. R.Crim.P. 43; N.Y.Crim. Proc. L. §§ 260.20 and 340.50; *People v. Winship,* 309 N.Y. 311, 313–14, 130 N.E.2d 634 (1955) (per curiam). Jurors are not blind fools, oblivious to the world around them. It is, I believe, safe to say that the jurors, who heard the prosecutor's comments concerning Agard's opportunity to hear the State's witnesses before he himself testified, had seen scores of trials portrayed in the movies and on television or had read about them; and almost without exception, the defendant was present during each trial. If for no other reason, the defendant is required to be present so that he may be identified. What juror has not felt a tingle as he witnessed the dramatic spectacle of a prosecutor pointing to the defendant and asking the victim "Is this the man who ——?"

Like all of us, jurors expect the defendant to be present in court, and, insofar as the lay jury is concerned, that expectation is based on plain common-sense, not the Sixth Amendment. Simply put, how could a defendant dispute the testimony of the prosecution's witnesses if he didn't know what they said?

I believe it is most unfair to the prosecutor in the instant case to hold that she "specifically target[ed] and cast suspicion upon the defendant's unique Sixth Amendment right to be present at his trial and hear all testimony." Oakes op. at 40. There was nothing "unique" about the defendant's presence, and I cannot agree that the prosecutor "cast suspicion" upon it. Defendants are present in courtrooms all across the country every working day. It was obvious to the jurors who sat through the ten-day trial that the defendant also was there and could hear the State's witnesses testify before he offered his own version of the events in question. In view of all of the foregoing, I search in vain for constitutional error in the prosecutor's statement concerning Agard's presence at trial.

My colleagues argue that the prosecutor's comment "invite[d] the jury to consider [Agard's] exercise of his right to confrontation as evidence of guilt, and therefore penalize[d] him for exercising that right." Oakes op. at 33. They say that this comment "impl[ied] that a truthful defendant would have stayed out of the courtroom before testifying." *Id.* The implication, in other words, is that a truthful defendant would have sequestered himself voluntarily, just as all other witnesses were involuntarily sequestered. The Supreme Court long ago provided the answer to this implication in *Geders v. United States,* 425 U.S. 80, 88, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976):

> But the petitioner was not simply a witness; he was also the defendant. A sequestration order affects a defendant in quite a different way from the way it affects a nonparty witness who presumably has no stake in the outcome of the trial. A nonparty witness ordinarily has little, other than his own testimony, to discuss with trial counsel; a defendant in a criminal

case must often consult with his attorney during the trial. Moreover, "the rule" accomplishes less when it is applied to the defendant rather than a nonparty witness, because the defendant as a matter of right can be and usually is present for all testimony and has the opportunity to discuss his testimony with his attorney up to the time he takes the witness stand.

My colleagues' assertion that jurors wouldn't recognize this distinction between defendants and witnesses again belittles the common sense of jurors. In attempting to measure the effect of the prosecutor's statement, I am unable to even visualize a juror rising to his feet in the jury room and saying, "If Agard is innocent, he would not have sat in the courtroom during the entire trial. He would have gone about his business and let his lawyer fend for himself."

As already observed, state appellate courts have a great deal more supervision and control over the conduct of their trial courts than do federal courts passing upon habeas corpus applications by state defendants. It is significant, therefore, that a number of state courts have found no violation of defendants' rights by comments similar to those of the prosecutor in the instant case. For example, in *State v. Robinson*, 157 N.J.Super. 118, 384 A.2d 569, 570 (App.Div.) (per curiam), *cert. denied*, 77 N.J. 484, 391 A.2d 498 (1978), the prosecutor argued that the defendant "had the ability to sit here and listen to the other witnesses testify." The court rejected the defendant's claim of error with the following language.

> We conclude that the prosecutor's comments did not in any way deprive defendant of his right to confront the witnesses against him or of his right to be present at his trial. Obviously he did confront these witnesses and was present at his trial. And a reasonable reading of the comments clearly reveals that they were a comment on the credibility of defendant's testimony. It is well settled that when a defendant waives his right to remain silent and takes the stand in his own defense, he thereby subjects himself to cross-examination as to the credibility of his story. And that issue would involve whether the story had been

fabricated. *State v. Kimbrough*, 109 N.J.Super. 57, 67, 262 A.2d 232 (App.Div. 1970); *State v. Burt*, 107 N.J.Super. 390, 393, 258 A.2d 711 (App.Div.1969), aff'd. o.b. 59 N.J. 156, 279 A.2d 850 (1971), *cert. denied*, 404. U.S. 1047, 92 S.Ct. 728, 30 L.Ed.2d 735 (1972). Here the issue of defendant's credibility was whether his testimony was tailored to that of the testimony of other witnesses, a perfectly proper inquiry.

The foregoing language was quoted verbatim in *People v. Buckey*, 424 Mich. 1, 378 N.W.2d 432, 438 (1985), where the same result was reached.

In *Reed v. State*, 633 S.W.2d 664, 666 (Tex.Ct.App.1982), the prosecutor told the jury: "And, you heard from the defendant. You heard the defendant's story. Of course, you got to hear the defendant's story after he had listened to everyone else testify—." The Court of Appeals said the "comment was a reasonable one, not manifestly improper and prejudicial, and did not deprive appellant of a fair trial." *See also State v. Howard*, 323 N.W.2d 872, 874 (S.D.1982).

In *United States v. Warren*, 973 F.2d 1304 (6th Cir.1992), trial below began on June 7, 1991. The Government made its opening statement on that day, but the defendant did not. The trial then was recessed until June 17 so that the judge could attend a judicial conference, and the recess continued for two more days because of illness of the judge's wife. In the prosecutor's closing argument to the jury, he said:

> I gave my opening argument, tomorrow it will be two weeks ago. The truth hasn't changed since I gave you the original opening argument. The defendant waited to hear our witnesses before coming up with his version of the truth yesterday. But I submit to you I have proven the case against James Henry Warren that I told you I would prove two weeks ago.

*Id.* at 1307.

The Court of Appeals held there was no error, stating:

> The argument of the prosecuting attorney is nothing more than fair comment on defendant's reservation of his opening

statement and his allegedly concocted testimony that he had merely assisted John Williams in the pawning of Williams' pistol. This is the kind of thrust and parry customary in jury argument.

*Id.*

I must confess that I am baffled by some of my colleagues' arguments. Judge Oakes states, for example, that "[i]t is perfectly proper for a prosecutor to cross-examine a defendant about those portions of his testimony which have indicia of fabrication." Oakes op. at 38. I agree. He then continues, "[w]hen, however, a prosecutor raises the specter of fabrication 1) for the first time on summation; 2) without facts in evidence to support the inference; or 3) in a manner which directly attacks the defendant's right to be present during his entire trial, our alarm bells begin to ring. When all three circumstances are present, the bells become shrill sirens." I have read and reread the prosecutor's statements and I heard neither bells nor sirens. Judge Oakes goes on, "Lawyers may not raise innuendo relating to bias or credibility from the shadows of unlitigated facts for the first time in their closing arguments." *Id.* at 38–39. If the lawyers were not litigating the facts relating to credibility during the course of the trial, I find it difficult to imagine what they were doing. To "fabricate" means to lie. *See* WEBSTER's THIRD NEW INTERNATIONAL DICTIONARY 811. The specter of fabrication pervaded the trial from its opening day. Winder testified that Agard committed anal sodomy on her; Agard said that he did not. One of them was not telling the truth. My colleague's statement, that the specter of fabrication was raised for the first time on summation and that there were no facts in evidence to support the inference of fabrication, is without basis in the record.

I am troubled by my colleagues' assertion that Agard had no chance to respond to the prosecutor's comments. "The normal function of rebuttal is to explain or rebut evidence offered by the adverse party." *United States v. Neary*, 733 F.2d 210, 220 (2d Cir. 1984). The Sixth Amendment protects a defendant's right to confront witnesses, not lawyers. Moreover, judges in both the New York and the federal courts are vested with discretion to reopen a case after the defendant has rested. *See People v. Harami*, 93 A.D.2d 867, 868, 461 N.Y.S.2d 376 (1983) (mem.); *People v. Benham*, 160 N.Y. 402, 437, 55 N.E. 11 (1899); *United States v. Burger*, 739 F.2d 805, 809–10 (2d Cir.1984). If the prosecutor's statements were as improper and as harmful as my colleagues now contend, defense counsel should have requested the trial court for permission to put the defendant back on the witness stand. In view of the lack of merit in the claim of prejudicial error, I doubt that such a request would have been granted. The telling fact is that defense counsel did not make the request.

I am troubled also by Judge Oakes' casual treatment of the trial judge's "standard jury instruction" that comments by the lawyers are not evidence and that the jury's recollection of events should control. "A crucial assumption underlying [the system of trial by jury] is that juries will follow the instructions given them by the trial judge." *Parker v. Randolph*, 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979) (quoted with approval in *Francis v. Franklin*, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985)). " 'In the absence of definitive studies to the contrary, we must assume that juries for the most part understand and faithfully follow instructions.' " *Connecticut v. Johnson*, 460 U.S. 73, 85 n. 14, 103 S.Ct. 969, 977 n. 14, 74 L.Ed.2d 823 (1983) (quoting Chief Justice Traynor's monograph on harmless error, *supra*, at 73–74, 103 S.Ct. at 970–71).

To repeat what I already have said, I believe it is absolutely essential for defendants to be present to hear the comments of the prosecution's witnesses so that they can respond to them and aid in their own defense. *See United States v. Gregorio*, 497 F.2d 1253, 1259 (4th Cir.), *cert. denied*, 419 U.S. 1024, 95 S.Ct. 501, 42 L.Ed.2d 298 (1974). Moreover, every juror with a modicum of common sense must realize that this is so. I find no error, therefore, in the prosecutor's comments about Agard's presence. "[C]onstitutional error occurs only when the prosecutorial remarks were so

 

prejudicial that they rendered the trial in question fundamentally unfair." *Garofolo v. Coomb*, 804 F.2d 201, 206 (2d Cir.1986). Forceful and vigorous argument by a prosecutor is not forbidden if based on the evidence. *United States v. Brown*, 456 F.2d 293, 295 (2d Cir.) (per curiam), *cert. denied*, 407 U.S. 910, 92 S.Ct. 2436, 32 L.Ed.2d 684 (1972); *United States v. Smith*, 778 F.2d 925, 929 (2d Cir.1985).

It would be a miscarriage of justice to call the state trial fundamentally unfair. My colleagues' discussions of possible inferences that a jury might draw are ingenious but not persuasive. Six state court judges and the district court below found no prejudicial error. Conviction on three counts out of nineteen after four days of deliberation is not very strong evidence of prejudice. Although we are not bound by the statement of the Appellate Division that proof of Agard's guilt was "overwhelming," cases such as *Alston v. Redman*, 34 F.3d 1237, 1242 (3d Cir.1994), *cert. denied*, 513 U.S. 1160, 115 S.Ct. 1122, 130 L.Ed.2d 1085 (1995), and *Tanner v. Vincent*, 541 F.2d 932, 937 (2d Cir.1976), *cert. denied*, 429 U.S. 1065, 97 S.Ct. 794, 50 L.Ed.2d 782 (1977), teach us that the following brief statement of facts in that court's opinion must be accorded substantial deference:

> The complainant testified that on May 6, 1990, the defendant held a gun to her head, threatened to kill her, and beat her in the course of forcing her to have anal intercourse by "forcible compulsion." Later at the emergency room of a hospital, the victim was found to have bruises on her arms and legs, a cut lip, and a black eye so seriously battered that she had hemorrhages in it four to five weeks later, as well as floating spots up to the day of trial. In addition, the defendant admitted to owning a gun, which was recovered by the police.

199 A.D.2d at 402, 606 N.Y.S.2d 239.

Miss Winder swore that she was sexually mistreated, and the indisputable facts clearly established that more than a simple amorous tete-a-tete had taken place. She said that she was threatened with a gun, and a gun was found in Agard's possession. Agard's abject apology found on Winder's answering

machine the following day was not made without a compelling reason.

When this appeal was argued in our Court, two young women came in, listened to the argument and then left. Although I had no way of knowing who they were, their presence reminded me that, whatever the morals of the two female complainants, they also have rights that courts should recognize.