**Rodney EVANS, Plaintiff,**

v.

**Christopher ARTUZ, Superintendent, Green Haven Correctional Facility, Defendant.**

**No. 97 CV 3017(RR).**

United States District Court, E.D. New York.

Sept. 30, 1999.

Rodney Evans, Stormville, NY, pro se.

Honorable Charles J. Hynes, Kings County District Attorney, Brooklyn By Phyllis Mintz, Assistant District Attorney, for Respondent.

### Memorandum and ORDER

RAGGI, District Judge.

Rodney Evans, proceeding pro se, petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Evans was convicted in 1990 after a jury trial of Murder in the Second Degree, N.Y. Penal Law § 125.25[1] (McKinney 1998), and Criminal Possession of a Weapon in the Second Degree, N.Y. Penal Law § 265.03 (McKinney 1998). He is presently incarcerated, serving concurrent prison terms of twenty years to life for murder and five to fifteen years for weapon possession. He now challenges his conviction on the grounds (1) that he was denied his right to be present at a material stage of his trial, specifically, portions of jury selection; (2) that the trial court denied him a fair trial by failing accurately to charge the jury on

the law; and (3) that prosecutorial misconduct in summation further denied him a fair trial.

Respondent initially moved to dismiss the petition as time-barred. This court granted the motion, relying on the "reasonable" time standard endorsed by the Court of Appeals in *Peterson v. Demskie,* 107 F.3d 92 (2d Cir.1997). *See Evans v. Artuz,* 68 F.Supp.2d 188 (E.D.N.Y.1999). The Second Circuit subsequently reconsidered *Peterson* in *Ross v. Artuz,* 150 F.3d 97 (2d Cir.1998) (granting prisoners whose convictions became final before the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 100 Stat. 1214, 1220 (1996), a one-year grace period to file for habeas relief). In light of *Ross,* the Circuit vacated this court's dismissal of Evans's petition and remanded the case for further proceedings. *See Evans v. Artuz,* No. 97–2764 (2d Cir. Sept. 25, 1998).

Both sides have now fully briefed the merits of Evans's claims. The court has carefully considered the submissions of the parties and the record of proceedings in the state courts. For the reasons stated herein, it concludes that Evans's claims are without merit and that his petition for a writ of habeas corpus must be denied.

### *Factual Background*

#### 1. *Introduction*

At approximately 5:30 p.m. on January 13, 1989, a number of young people, most in their teens and early twenties, left Midwood High School in Brooklyn where they had just attended a basketball game and went to the nearby McDonald's restaurant at 2154 Nostrand Avenue. For the better part of an hour, these high school and college students ate, talked, and generally enjoyed themselves. Suddenly, gunshots were heard, and within moments, 18–year old Tondalayo Alfred was fatally wounded, the innocent victim of an attempt by 18–year old petitioner Rodney Evans to kill a neighborhood youth known simply as "Freddy."

#### 2. *Trial* [1]

Rodney Evans conceded that he fired the shot that killed Tondalayo Alfred on January 13, 1989. The key point in dispute at his trial was whether he had acted in a reasonable attempt to defend himself against Freddy.

#### a. *The Prosecution Case*

To support its theory that Evans was guilty of second degree homicide committed without justification, the prosecution relied on the testimony of three eyewitnesses, Tasha George, Joann Ross, and the victim's younger sister, Tobia Alfred. Ms. George, the only one of the three who knew both Evans and Freddy, testified that she had a brief, inconsequential conversation with petitioner in the McDonald's on January 13, 1989. Then, as she was getting ready to leave the restaurant, she saw Freddy, whom she also knew, standing by the Nostrand Avenue entrance. Ms. George was about to greet Freddy when she heard a gunshot. She turned and saw that petitioner was firing at Freddy. Ms. George saw Freddy, who was unarmed, twist a restaurant chair out of its base and then use it to shield himself from the gunfire. Ms. Ross, who did not know Evans but who would later identify him in a police lineup, testified that she also saw petitioner fire his gun repeatedly toward the front of the restaurant. There were no shots fired from the opposite direction. The third eyewitness, Tobia Alfred, testified that she too heard gunfire in the McDonald's. She turned in its direction and caught a glimpse of a young man shooting a 9 mm semi-automatic pistol. She could not identify the shooter since she and her older sister, Tondalayo, quickly sought cover under their table.

1. Rodney Evans was tried twice for the murder of Tondalayo Alfred. His first prosecution ended in a mistrial when a juror became ill during deliberations.

Their efforts proved futile. Shots continued to be fired, one of which struck Tondalayo Alfred in the arm, the other of which entered her chest, piercing her heart and lungs and ultimately killing her.

Considerable ballistics evidence was recovered at the crime scene, but no gun was ever found. Police experts would testify that the four spent shells and various deformed bullets found at the McDonald's, as well as the bullet that killed Tondalaylo Alfred, were all fired from the same 9 mm weapon. There was no ballistics evidence to suggest that any other gun had been fired.

### b. *The Defense Case*

The crux of the defense case was the testimony of petitioner Rodney Evans. He admitted that on January 13, 1989, he carried a loaded 9 mm gun into the Nostrand Avenue McDonald's and fired it repeatedly at Freddy. He insisted that he acted in self defense after Freddy drew a gun and pointed it at him. Evans explained that he greatly feared Freddy, who was reputed to have killed one of petitioner's friends the previous month. In the intervening weeks, various friends told Evans that Freddy was looking to kill him too. Evans stated that he had never quarreled with Freddy and knew of no reason why the man would wish to harm him. Nevertheless, Evans began to carry a loaded firearm whenever he thought he might encounter Freddy.

Evans testified that he had purchased his 9 mm gun the previous summer in Virginia. He claimed to have been the victim of various unreported robberies and thought a gun would afford him protection. In fact, Evans never carried the weapon until he heard of Freddy's threats against him.

Evans insisted that the last person with whom he discussed these threats was Tasha George in the McDonald's restaurant on January 13, 1989. He claimed that Ms. George asked Evans why Freddy was looking to kill him.[2] Soon after, Freddy entered the restaurant, saw petitioner, and pulled a gun from his rear waistband. Evans testified that he could not recall if Freddy ever fired the gun; nevertheless, he insisted that he feared for his life and for that reason started to discharge his own weapon.[3] He stated that he had never operated a gun before, but relied on what he had seen on television in pulling back the slide and firing a number of rounds. Evans asserted that his intent had not been to kill Freddy but only to frighten him. He acknowledged that after he began shooting, Freddy threw a chair at him, but he could not recall exactly how he did this.[4] Evans fled from the rear of the restaurant to avoid any further encounter with Freddy.

### 3. *Procedural Background*

The jury found Evans guilty of intentional Murder in the Second Degree and Criminal Possession of a Weapon in the Second Degree. On March 27, 1990, he was sentenced to concurrent terms of

---

2. As already noted, Ms. George acknowledged speaking with Evans shortly before the shooting on January 13, but she denied discussing any threat by Freddy. On the prosecution's rebuttal case, Detective Dennis Minogue testified that Evans never related the purported conversation with Ms. George in any of his post-arrest statements.

3. On cross-examination, the prosecution demonstrated that before Evans learned that police tests indicated that all ballistics evidence came from a single firearm, he had sought to justify his conduct by ascribing a more ag-

gressive role to Freddy. He told the grand jury that Freddy "pulled out a gun, and he fired 1 time at me, so I got scared and fired back. He was firing to kill. I was firing to protect myself." Indeed, petitioner told the grand jury, "He [Freddy] fired quite a few times." Trial Trans. at 323–24.

4. Only two weeks earlier, at Evans's first trial, he had twice demonstrated how Freddy threw the chair, using both hands. The prosecutor had argued that such action was inconsistent with Evans's claim that Freddy had a gun in one hand.

twenty years to life for murder and five to fifteen years for weapon possession.

On direct appeal to the New York Supreme Court, Appellate Division, Second Department, Evans filed briefs both through counsel and pro se. He challenged (1) the trial judge's charge on justification, interested witnesses, and intent; (2) the sufficiency of the evidence; (3) the prosecutor's summation; (4) the trial court's treatment of defense counsel; (5) limitations on defense cross-examination; and (6) his exclusion from parts of the jury selection process.

While this appeal was pending, Evans filed a pro se motion with the trial court to vacate his conviction pursuant to N.Y.Crim. Proc. Law § 440.10 for the prosecution's alleged failure to disclose an autopsy tape as required by *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881, *cert. denied*, 368 U.S. 866, 82 S.Ct. 117, 7 L.Ed.2d 64 (1961) and N.Y.Crim. Proc. Law § 240.45(1)(a). On March 7, 1994, the Supreme Court denied the motion finding (1) that Evans had failed to establish the existence of the tape at issue; and (2) that, even if the Medical Examiner's office had prepared such a tape, the prosecution could not be found in violation of state law for failing to produce material in the possession of a non-investigatory department. *See People v. Evans*, No. 763/89 (N.Y. Sup.Ct. Kings Co. Mar. 7, 1994). On May 20, 1994, the Appellate Division, Second Department, summarily denied leave to appeal. *See People v. Evans*, No. 94–02786 (N.Y.App. Div.2d Dep't May 20, 1994).

A few months later, on August 22, 1994, the Appellate Division affirmed petitioner's judgment of conviction. *See People v. Evans*, 207 A.D.2d 500, 615 N.Y.S.2d 914 (2d Dep't 1994). It ruled that the evidence was sufficient to support the jury's verdict of guilty *See id.* at 500, 615 N.Y.S.2d at 915. The court also rejected petitioner's claim that he had been denied his right to be present during material stages of his trial. It found that part of the claim was factually unsupported. *See id.* ("While the defendant was not present when the challenges were discussed, he was present during the entire voir dire and was present when the challenges were given effect, because the challenged jurors were excused and others were sworn in open court"). The remainder depended on a state court ruling that did not apply retroactively to jury selections occurring before April 7, 1992. *See id.* at 500, 615 N.Y.S.2d at 914 (discussing *People v. Sloan*, 79 N.Y.2d 386, 583 N.Y.S.2d 176, 592 N.E.2d 784 (1992), which held that defendant has a right to be present when potential jurors questioned about "attitudes and feelings concerning some of the events and witnesses involved in the very case to be heard"). All other claims were rejected because they "are either unpreserved for appellate review or do not warrant reversal." *Id.* at 500, 615 N.Y.S.2d at 915.

On or about April 21, 1997, Evans filed his petition for a writ of habeas corpus with the United States District Court for the Southern District of New York. On May 21, 1997, the case was transferred to this district.

### Discussion

#### I. *Standard of Review*

This court's review of Evans's petition is governed by the standards articulated in the AEDPA, which significantly amended the federal habeas statute, 28 U.S.C. § 2254. Subsection (d) of § 2254 now provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence in the State court proceeding.

Although the Second Circuit has yet to discuss how these standards should be applied, a number of other appellate courts have endeavored to provide guidance. *See Long v. Humphrey*, 184 F.3d 758, 760 (8th Cir.1999); *Matteo v. Superintendent*, 171 F.3d 877, 891 (3d Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 73, —— L.Ed.2d —— (1999); *Davis v. Kramer*, 167 F.3d 494, 500 (9th Cir.1999), *petition for cert. filed*, 67 U.S.L.W. 3570 (U.S. Mar. 8, 1999) (No. 98–1427); *Nevers v. Killinger*, 169 F.3d 352, 361–62 (6th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 2340, 144 L.Ed.2d 237 (1999); *O'Brien v. Dubois*, 145 F.3d 16, 24 (1st Cir.1998); *Green v. French*, 143 F.3d 865, 870 (4th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 844, 142 L.Ed.2d 698 (1999); *Neelley v. Nagle*, 138 F.3d 917, 924 (11th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 811, 142 L.Ed.2d 671 (1999); *Drinkard v. Johnson*, 97 F.3d 751, 767–68 (5th Cir.1996); *Lindh v. Murphy*, 96 F.3d 856, 870 (7th Cir.1996), *rev'd on other grounds*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *see also Patterson v. Headley*, 58 F.Supp.2d 274, 280–81 (S.D.N.Y.1999) (discussing different approaches endorsed by various circuits). Particular effort has been made to explain what constitutes an "unreasonable application of" Supreme Court precedent by a state court. In *Matteo v. Superintendent*, 171 F.3d at 891, the Third Circuit stated that a habeas court should ask "whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified." The Ninth Circuit, in *Davis v. Kramer*, 167 F.3d at 500, ruled that "a state court decision amounts to an unreasonable application of clearly established federal law where the state court fails to apply a legal principle, enunciated in one or more Supreme Court decisions, to a situation where such application is required by the force and logic of the court's

decision." The First Circuit, in *O'Brien v. Dubois*, 145 F.3d at 24, held that "for the writ to issue, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible credible outcomes." Meanwhile, the Fifth Circuit has ruled that a state court's application of law to facts is unreasonable only if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." *Drinkard v. Johnson*, 97 F.3d at 769.

Evans is not entitled to a writ of habeas corpus because he cannot show that the state courts' rejection of his claims was an unreasonable application of Supreme Court precedent under any of these articulations of the § 2254(d) standard of review.

## II. *Right to Be Present for Jury Voir Dire*

Evans submits that he was denied due process of law when (1) the trial court arranged for the attorneys to identify their jury challenges in the robing room outside his presence, and (2) two jurors who indicated they had heard about Evans's case were questioned under similar circumstances. The court finds that petitioner's exclusion from robing room conferences did not infringe his due process rights. In any event, it finds that Evans waived any right to be present by failing to object to the court's procedures.

■■ The Supreme Court has interpreted the Due Process Clause to ensure a defendant's "right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819–20 n. 15, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *accord Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987); *Tankleff v. Senkowski*, 135 F.3d 235, 246 (2d Cir.1998). This is generally understood to include the impaneling of the jury. *See* Fed. R.Crim. Pro. 43(a); *Tankleff v.*

*Senkowski*, 135 F.3d at 246. The right is not, however, absolute. In *United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985), the Supreme Court expressly held that due process does not require a defendant to be present for every brief discussion involving the court, a juror, and counsel. At issue in that case was the trial court's in camera questioning of a sitting juror who had expressed concern about the fact that defendant appeared to be sketching members of the jury. The Supreme Court ruled that

> the conference was not the sort of event which every defendant had a right personally to attend under the Fifth Amendment. Respondents could have done nothing had they been at the conference, nor would they have gained anything by attending. Indeed, the presence of Gagnon and the other respondents, their four counsel, and the prosecutor could have been counterproductive.

*Id.* at 527, 105 S.Ct. 1482 (internal citation omitted); *see also Kentucky v. Stincer*, 482 U.S. at 745–47, 107 S.Ct. 2658 (holding that right to be present not infringed by defendant's exclusion from hearing to determine competency of child witnesses).

So in this case, Evans's absence from the formal exercise of jury challenges in the robing room did not deny him due process of law. He was able to view every potential juror as he or she answered voir dire questions in open court. He had the chance to consult with his attorney about challenges before the attorney retired with the court to the robing room. He was present when the court clerk excused certain jurors and seated others. In sum, his absence from the robing room during the formal exercise of challenges did not affect his ability to participate meaningfully in jury selection or otherwise frustrate the fairness of the proceedings against him. Indeed, it was of no more significance than a defendant's absence from a sidebar conference, at which defense counsel routinely announce their jury challenges without their clients. *See generally Gaiter v. Lord*, 917 F.Supp. 145, 152 (E.D.N.Y.1996) ("the Federal Constitution does not require a defendant's presence at sidebar conferences"); *accord Brown v. Edwards*, No. 96 Civ. 3444, 1998 U.S. Dist. LEXIS 395, at * 17 (S.D.N.Y. Jan. 15, 1998).

Neither was Evans denied due process by the court's in camera questioning of two jurors who said they had heard about his case. This was a relatively brief interlude in the larger voir dire of the jury panel, all of which did take place in Evans's presence. As in *United States v. Gagnon* and *Kentucky v. Stincer*, petitioner's interests were represented at the in camera proceeding by his trial counsel. *See also United States v. Aiello*, 771 F.2d 621, 629–30 (2d Cir.1985) (recognizing trial judge's broad discretion to conduct in camera interrogation of sitting jurors, although preferable for counsel to be present at inquiry). Certainly, Evans does not suggest that his presence would have affected the court's decision to excuse for cause the one juror who stated that she knew his brother. *Cf. Kentucky v. Stincer*, 482 U.S. at 747, 107 S.Ct. 2658 ("no indication" that defendant's "presence at the competency hearing ... would have been useful in ensuring a more reliable determination.") As to the other juror, although Evans may not have personally observed her discuss the news reports she had seen about the case or heard her state that she could nevertheless serve fairly and impartially, he had the opportunity to assess her demeanor during other parts of the voir dire. This, coupled with his attorney's participation in the robing room conference, sufficed to ensure that any subsequent decision about peremptory challenges was made in an informed and fair manner.

Assuming arguendo that due process did entitle Evans to attend the robing room conferences in his case, he would still not be entitled to habeas corpus relief since his failure to object to these proceedings can be viewed as a waiver of his right

to be present.[5] In *United States v. Gagnon*, the Supreme Court ruled that

> The district court need not get an express "on the record" waiver from the defendant for every trial conference which a defendant may have a right to attend ... A defendant knowing of such a discussion must assert whatever right he may have ... to be present.

470 U.S. at 528, 105 S.Ct. 1482. Citing *Gagnon*, the Second Circuit in *Tankleff v. Senkowski*, 135 F.3d at 246–47, found that a habeas petitioner who did not object to the trial court's in camera interview of 150 potential jurors waived his right to be present. In that case, the "interviews focused on the potential jurors' ability to be fair and impartial in light of the media coverage of the case." *Id.* at 247. The Court of Appeals thought it likely that petitioner and his lawyers "did not think it was important for him to be present at this tedious, routine screening designed to eliminate jurors who had been prejudiced by pretrial publicity." *Id.; accord United States v. Gallego*, 191 F.3d 156, 172 (2d Cir.1999) (failure to object waived any right defendant had to participate in robing room examination of potential jurors). The conclusion seems equally applicable to Evans's case. Petitioner's failure to object to the trial court's decision to conduct limited voir dire in the robing room constitutes a waiver of any right he may have had to be present.

Because Evans has failed to show that his absence from robing room conferences denied him due process under clearly established Supreme Court precedent, and because his failure to object indicates a waiver of any right to be present, the court hereby rejects this part of petitioner's application for a writ of habeas corpus.

### III. *Charging Errors*

Evans contends that the trial court committed various errors in charging the jury on the applicable state law, specifically, it (1) misstated the law on justification, (2) incorrectly charged as to interested witnesses, and (3) failed to instruct the jury as to the meaning of "intent."

Respondent submits that the first two challenges are procedurally barred from federal review because their rejection by the Appellate Division was based on an independent state law ground, *i.e.*, the failure to raise a contemporaneous objection at trial. *See Coleman v. Thompson*, 501 U.S. 722, 751, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *accord Epps v. Commissioner of Correctional Services*, 13 F.3d 615, 617 (2d Cir.1994). Unfortunately, the Appellate Division did not "clearly and expressly" state that its rejection of these claims was based on a state procedural bar as opposed to their lack of merit, which was argued in the alternative. *Coleman v. Thompson*, 501 U.S. at 735, 111 S.Ct. 2546. Instead, these challenges were among those generally rejected because they were "unpreserved for appellate review or [did] not warrant reversal." *People v. Evans*, 207 A.D.2d at 500, 615 N.Y.S.2d at 915. Under these circumstances, respondent's procedural bar argument must be rejected. *See Tankleff v. Senkowski*, 135 F.3d at 247.

This does not mean that petitioner is entitled to habeas relief. The Supreme Court has clearly ruled that errors of state law injury instructions do not constitute a federal constitutional violation unless they "so infect[ ] the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *accord Blazic v. Henderson*, 900 F.2d 534, 541 (2d Cir. 1990). Petitioner cannot meet this standard. Indeed, he cannot even show that

---

5. While in the robing room, Evans's counsel did at one point ask if he could take the jury board "outside," presumably to consult with his client in the courtroom. *See* Voir Dire Trans. p. 9. When the trial judge said that she

did not "want the jury to see who was challenged by the defense," *id.*, counsel voiced no objection. Neither did he ask to consult further with his client without the board.

the charges were erroneous under state law.

### A. Justification

■ Evans complains that the trial court's charge on justification erroneously instructed the jury to consider "whether a reasonable person in the defendant's situation *would* reasonably believe that the degree of force used was, in fact, warranted and necessary to defend himself under all the circumstances in this case," Trial Trans., p. 487 (emphasis added), instead of charging "*could* reasonably believe." He submits that the latter formulation is broader and therefore more favorable to him.

In fact, the distinction appears to be of no import under New York law. "Could" was used by the New York Court of Appeals in *People v. Goetz*, 68 N.Y.2d 96, 506 N.Y.S.2d 18, 497 N.E.2d 41 (1986) in outlining the second prong of New York's "reasonable belief" test.

> The jury must first determine whether the defendant ... believed deadly force was necessary to avert the imminent use of deadly force. ... If the People do not prove beyond a reasonable doubt that he did not have such beliefs, then the jury must also consider whether these beliefs were reasonable. The jury would have to determine ... if a reasonable person *could* have had these beliefs.

*Id.* at 115, 506 N.Y.S.2d at 29–30, 497 N.E.2d 41 (emphasis added). But that court does not appear to have been drawing any "could/would" distinction. To the contrary, it appeared to view the words as functional equivalents. For example, the Court of Appeals indicated that it agreed with the Appellate Division dissenters in *Goetz* who recognized that justification "requires consideration of both the defendant's subjective beliefs and whether a reasonable person in defendant's situation *would* have had such beliefs." *Id.* at 105, 506 N.Y.S.2d at 23, 497 N.E.2d 41 (emphasis added). Further, in tracing the history of the objective component to a justifica-

tion defense, the Court of Appeals cited approvingly to the charge upheld in *People v. Lumsden*, 201 N.Y. 264, 94 N.E. 859 (1911), which instructed the jury "to consider whether the circumstances facing defendant were such 'as *would* lead a reasonable person to believe that [an assailant] is about to kill or to do great bodily injury.'" *Id.* at 108, 506 N.Y.S.2d at 25–26, 497 N.E.2d 41 (quoting *People v. Lumsden*, 201 N.Y. at 268, 94 N.E. 859) (emphasis added).

Not surprisingly then, New York courts have found that any distinction between "would" and "could" in charging justification is "de minimus." *See People v. Luzunaris*, 162 A.D.2d 296, 556 N.Y.S.2d 642 (1st Dep't 1990) (rejecting challenge to use of "would"). Indeed, the recommended charge on justification in the state's Pattern Criminal Jury Instructions uses "would" in describing the required objective standard.

> The second test is an objective test—was the defendant's belief "reasonable" under all of the circumstances. This second test requires you to consider whether the average reasonable person, finding himself in the same situation as did this defendant, *would* also reasonably believe that defensive physical force was necessary to defend himself against the use of offensive physical force by his assailant.

1 CJI(N.Y.) 35.15(1) p. 892 (1989) (emphasis added).

In sum, petitioner cannot show that the court's justification charge was erroneous under state law, and thus cannot carry the heavier burden of establishing a violation of constitutional due process.

### B. Interested Witness

■ Evans complains that the trial court denied him a fair trial when it charged the jury that he was an interested witness but did not so characterize any prosecution witnesses. The challenged section of the charge reads as follows:

How do you go about deciding credibility of witnesses? ... You should consider the personality and background of the witness, his or her demeanor and bearing on the witness stand, the reasonableness or unreasonableness of the testimony, his means of knowledge or opportunity [for] observation, his interest or lack of interest in the outcome of the case.

. . . . .

Obviously, the defendant, who testified, is an interested witness, since he has a primar[y] interest in the outcome of the case; however, there is no legal presumption that an interested witness lies, and there is no legal presumption a witness who has no apparent interest tells the truth.

The whole question of the interest a witness [has in the outcome of the case] and its [e]ffect on the testimony is for you to decide from all the evidence in the case.

Trial Trans. pp. 464–65.

█ A defendant may be identified as an interested party as long as the jury understands that such interest does not preclude a finding that he or she is telling the truth. *See, e.g., United States v. Matias,* 836 F.2d 744, 750 (2d Cir.1988) (and cases cited therein). The cited instruction was properly balanced to make this point. Further, although only the defendant was specifically identified as an interested witness, the jury was told to consider interest in assessing the credibility of each person who testified. This was sufficient to allow defense counsel to challenge the testimony of certain witnesses either because they were related to the victim or because they were friendly with Freddy. Under these circumstances, petitioner was plainly not denied his due process right to a fair trial. *See id.*

C. *Intent*

█ Similarly meritless is Evans's complaint that the trial court failed adequately to charge "intent." A person acts intentionally when he acts deliberately and purposefully, and when his actions are the product of conscious objective rather than innocent mistake or accident. *See* 1 L. Sand, et al., Modern Federal Jury Instructions, Inst. 3A–4 (1998). This concept was adequately conveyed by the following instruction to the jury regarding the "intent to cause death" requirement of second degree murder:

According to the law, a person intends to cause the death of another when that is his conscious aim or objective. It is not necessary for the People to establish that intent to kill was present in the mind of defendant for any period of time before he discharged his weapon. It is sufficient if you find that such intent was in his mind when he discharged the weapon.

In this case, the People claim that the defendant committed the crime of murder by causing the death of a third person while intending to cause the death of another. It isn't necessary for the People to prove that the defendant intended to cause the death of Tondelayo Alfred. It is sufficient if the People pro[ve] to you beyond a reasonable doubt that he intended to cause the death of another, but, in fact, his actions caused the death of Tondelayo Alfred.

Trial Trans. pp. 477–78. Not surprisingly, Evans fails to show how any more detailed instruction on the concept of intent would have assisted the jury. During deliberations, a question did arise as to whether "intent to cause death" was a required element of reckless murder in the second degree. That inquiry did not, however, require more detailed instructions on the general nature of intent.

In sum, the court finds that none of petitioner's complaints about the trial judge's instructions on issues of state law has merit. None indicates that his trial was so infected with unfairness as to constitute a denial of due process.

IV. *Prosecutorial Misconduct in Summation*

Evans contends that misconduct by the prosecutor in summation violated his due process right to a fair trial. Specifically, he complains that the prosecutor (1) unfairly suggested that he had tailored his testimony to conform to that of various prosecution witnesses, (2) impermissibly shifted the burden of proof to the defense, (3) denigrated defense counsel, and (4) improperly appealed to the jury's emotions.

Respondent submits that the first two arguments are procedurally barred for lack of any contemporaneous objection at trial. As already noted, because the Appellate Division did not clearly state which of Evans's arguments it was rejecting on independent state law procedural grounds, this court cannot assume any procedural bar.

■■■ In considering the merits of Evans's claim of prosecutorial misconduct, this court is mindful that petitioner "bears a substantial burden." *United States v. Millar*, 79 F.3d 338, 343 (2d Cir.1996). The Supreme Court has expressly held that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's [inappropriate] comments standing alone" in an otherwise fair proceeding. *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Thus, "it is not enough [for petitioner to show] that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). To establish a constitutional violation, a petitioner must show that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *accord Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir.1991). Further, when a prosecutor's summation is reviewed in connection with a petition for a writ of habeas corpus, the appropriate standard of review is "the narrow one of

due process, and not the broad exercise of supervisory power." *Donnelly v. DeChristoforo*, 416 U.S. at 642, 94 S.Ct. 1868; *accord Darden v. Wainwright*, 477 U.S. at 181, 106 S.Ct. 2464; *Tankleff v. Senkowski*, 135 F.3d at 252.

In this case, none of the comments complained of by petitioner deprived him of his due process rights to a fundamentally fair trial.

A. *Tailoring Testimony*

■■■ Evans contends that he was denied a fair trial by the prosecutor's suggestion in summation that he had tailored his testimony to fit that of certain prosecution witnesses. He specifically complains of the following statement:

> [Tobia Alfred and Joanne Ross] don't say anything different than the defendant. The defendant admits he was firing the gun and the defendant says maybe Freddy didn't shoot his gun. He is not sure, but you have to remember Tobia Alfred and Joanne Ross took the stand during the prosecution's case, which came first, and we couldn't know what story the defendant was going to cho[o]se to tell when he testified at this trial, because you might recall if he picked the story he told the grand jury, in the grand jury he said Freddy fired at him not once, but several times right in his direction. Had that been the story the defendant chose to tell at this trial, certainly Tobia and Joanne's testimony would be much more important.
>
> In fact, *I submit to you it was in part because of their testimony, because they came here and the defendant heard them testify that he had to change his testimony and fit it to suit the evidence in this case.*

Trial Trans. pp. 414–15 (emphasis added). No objection was raised to this comment at trial. Now, relying principally on the Second Circuit's decision in *Agard v. Portuondo*, 117 F.3d 696 (2d Cir.1997), *reh'g denied*, 159 F.3d 98 (2d Cir.1998), Evans

submits that the argument denied him due process.

This court is fully familiar with the facts in *Agard v. Portuondo,* having handled the case at the district court level. In *Agard,* the prosecutor had argued that the defendant had a "big advantage" over other witnesses: "he gets to sit here and listen to the testimony of all the other witnesses before he testifies." *Id.* at 707. This allowed him to "think what am I going to say and how am I going to say it? How am I going to fit it into the evidence?" *Id.* The Second Circuit ruled that this argument unfairly commented on the defendant's constitutional rights to testify in his own behalf and confront the witnesses against him in violation of due process. *Id.* at 710, 713–14.

A preliminary question arises as to whether *Agard v. Portuondo* controls this court's consideration of Evans's petition. The AEDPA requires habeas courts to review state court decisions in light of the Supreme Court's articulation of clearly enunciated federal rights.[6] As Judge Oakes observed in the majority opinion in *Agard,* no federal case—certainly none by the Supreme Court—had previously addressed the constitutionality of a summation argument commenting on defendant's presence at trial. *See id.* at 707.[7] The various state courts were split on the issue. *See id.* at 707–08 (citing cases from the highest courts of Connecticut, Maine, Vermont, Massachusetts, and the District of Columbia finding such arguments improper, as well as cases from Michigan's highest court and the intermediate appellate courts of Minnesota, New Jersey and Texas ruling otherwise). The *Agard* panel

was itself divided, issuing a total of five opinions in the case. *See id.* at 698 (Oakes, J.); 715 (Winters, J., concurring); 716 (Van Graafeiland, J., dissenting); 159 F.3d at 99 (Winter, C.J.) (denying rehearing); *id.* at 100 (Van Graafeiland, J., dissenting). Since the Supreme Court has granted certiorari, *see Portuondo v. Agard,* —— U.S. ——, 119 S.Ct. 1248, 143 L.Ed.2d 346 (1999), it is possible that the law will be clarified sometime next year. This court, however, cannot say that New York's rejection of petitioner's argument—assuming it was based on the merits rather than the procedural default—was at odds with clearly established federal law as then enunciated by the Supreme Court.

In any event, the court finds Evans's case distinguishable from *Agard.* Three factors were of particular concern to the *Agard* majority: (1) the possibility that defendant's testimony was fabricated was raised for the first time in summation, (2) no facts in evidence indicated fabrication,[8] and (3) the prosecution's argument directly attacked the defendant's right to be present during his trial. *See Agard v. Portuondo,* 117 F.3d at 711. None applies in this case.

Throughout Evans's trial, it was apparent that the prosecutor would argue that his testimony was fabricated. During petitioner's cross-examination, she questioned him at length about his different accounts of the relevant facts, as well as the relation between those accounts and what he then knew about the prosecution's evidence. *See, e.g.,* Trial Trans. pp. 316 (did not say Freddy fired gun in post-arrest interview); 323–24 (tells grand jury Freddy fired first,

---

6. *Agard v. Portuondo* was filed before the effective date of the AEDPA, and was not reviewed under the stricter standards of that law.

7. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), relied on by the majority in *Agard v. Portuondo,* 117 F.3d at 709, holds that "comment on the [defendant's] refusal to testify" is barred by the Fifth Amendment.

8. In concurrence, Judge Winter suggested that he would limit the court's ruling to cases in which "the only evidence supporting the inference that appellant tailored his testimony to the prosecution's case was his presence in the courtroom and that testimony itself." *Id.* at 715.

"fired quite a few times"); 317 (unaware of ballistics report when testifying before grand jury); 325–26 (testifies grand jury testimony was inaccurate; not sure if Freddy fired his gun); 332 (has "no idea" how Freddy threw chair at him); 333 (at first trial "guessing" as to how Freddy threw chair); 336 (acknowledges hearing prosecution argument at first trial that his version of events regarding the chair defeated justification defense); 336–37 (specifically confronted with different accounts of chair incident from first and second trials). Thus, unlike Agard, Evans could have responded to this attack on his credibility by offering arty evidence of prior statements consistent with his trial testimony. *Cf. Agard v. Portuondo*, 117 F.3d at 715 (Winter, J. concurring) (Agard "had no chance to anticipate and rebut" the prosecution's argument, first advanced in summation, that he had tailored his testimony).

Further distinguishing this case is specific evidence throughout the record that petitioner "had earlier given a different version of events and altered the version after learning of the prosecution's evidence." *Id.* Indeed, the prosecutor devoted a considerable portion of her summation to reviewing the evidence that Evans had "change[d] and alter[ed] his story each and every time he [told] it" to deal with specific evidence. Trial Trans. p. 411. In denying rehearing in *Agard v. Portuondo,* Judge Winter expressly distinguished between an impermissible "general argument that a defendant's credibility is less than that of prosecution witnesses solely because he attended the entire trial" and a permissible factual argument "that a defendant used his familiarity with the testimony of the prosecution witnesses to tailor his own exculpatory testimony." 159 F.3d at 99. A review of the prosecution's argument in Evans's case demonstrates that it clearly fits into the latter category, and that even if "one factual element" of the argument was petitioner's presence during the trial, "its principal focus [was] on a comparison of defendant's testimony with the testimony of other witnesses." *Id.*

The prosecutor initially reminded the jury of the differences between Evans's post-arrest statements and his testimony to the grand jury. She suggested that the latter version of events was expanded to justify the fact that potential eyewitnesses recalled Evans firing his gun multiple times.

> Now, what does the defendant claim happened that night? Early on, the morning after the shooting, the police officers come to the defendant's house and they arrest him for the shooting that took place in McDonald's. It's clear to the defendant at that time that the police know that he was the shooter inside of McDonald's.
>
> . . . [W]hat does he do? He does something easy. He claims he sees Freddy reach . . . He thought it was a gun, that is what he tells the police.
>
> Twelve days later he is going to testify in the grand jury, and the reaching isn't good enough, because he fired more than once. There [are] only so many times you can shoot a gun at a guy if all he does is move his hand toward the back of his waist.

Trial Trans. pp. 439–40.

The prosecutor then demonstrated how petitioner again shifted from his specific testimony in the grand jury to his more general testimony at trial in order to accommodate evidence indicating that there was only one shooter.

> [I]n his initial statement to the grand jury, the defendant says Freddy fired a shot at him. Very clearly, very unequivocally. Not, "I think Freddy fired a shot." Very clearly Freddy fired a shot.
>
> . . . He is then asked questions by the DA, and one of the questions he is asked is, "Did anybody else fire shots at you?" and the defendant says, "He fired several times." The DA goes, "He fired several times?" The defendant says, "Yes."

He said, "In your direction?" The defendant says, "Right."

... [N]ow the ballistics evidence shows evidence from only one gun, and now he has heard all the other witness[es] who also testified against him, and saw just one shooter, so he comes into this courtroom and he has got to back off that grand jury testimony ... so he tells you for the first time, "I told the grand jury when I made my first statement I was scared. I was nervous."

For the second statement, when he said he fired several times, then the questions were coming too quickly. "I misunderstood." What did he think the DA was asking when he answered, "He fired several times"? He didn't have one question. There was a little colloquy that went on....

He was in trouble when he took the stand in this trial, because he couldn't use that s[a]me story, because the evidence contradicted it too much, and his instinct for survival said he had to back off it, and that is what he does.

*Id.* at 441–43.

Next, the prosecutor argued at length that Evans had changed his testimony even as between the first and second trial to blunt a prosecution argument based on his own initial cross examination.

Perhaps the most damaging piece of evidence against the defendant is the evidence about the chair Freddy threw at him.

Two weeks ago, when the defendant testified at ... a prior proceeding ... I asked him why don't you demonstrate how he picked up the chair. The defendant stepped down off of the stand and stood right here and demonstrated with two hands, so I asked him, "He held the chair with two hands?" and the defendant's instinct for survival told us, "Oops, I goofed," because if he had that chair with two hands, obviously he had no gun, so while he is standing here with two hands, he says no.

I said you're demonstrating with two hands. Show us how he held the chair. He demonstrates again, but he uses two hands again. I said, "You're using two hands again." He says, "It was one hand." I say, "Why don't you show us." Then he stepped back on the witness stand, and using his own chair, he picked it up. He said he picked it up by the arm and threw it at me. Of course the chairs in McDonald's have no arms....

At the end of the last proceeding, the defendant heard me stand up and argue that he had slipped by mentioning the chairs, because if Freddy had a gun, he wouldn't be picking up chairs. Knowing that, he comes into this trial, and he knows he has got to fix that chair testimony. It was too damaging. It hurt his defense too much, so what does he do?

... He said, "It happened so fast, I can't really recall exactly." Two weeks earlier he had recalled quite specifically what happened.

On cross examination [at this trial], ... I said demonstrate. He said I don't know. I said you knew two weeks ago. He said he was guessing.... He was very clear two weeks ago ... how clearly he testified about the chair, how Freddy held the chair and threw the chair.

Ladies and gentlemen, obviously Freddy had no gun. If he did, he wouldn't have picked up a chair.... Look at these chairs. They are attached to poles, and in order to pick them up, you have to twist the chair ... and lift it right up. You have to use two hands.

Now, the defendant admitted Freddy picked up a chair. You must use two hands to do it. Freddy didn't have a gun, and the defendant's biggest slip was mentioning the chair, and try asking him to back off from it. He can't.

*Id.* at 444–50.

██ Finally, when the objected-to remarks are viewed in conjunction with

these excerpts, it becomes clear that the prosecutor's summation, viewed as a whole, never made any direct reference to Evans's exercise of his right to be present at trial. The argument advanced was not that defendant's presence at trial afforded him a unique opportunity to tailor his testimony. The argument was that Evans had tailored and re-tailored his version of events to fit the proof of guilt confronting him as the investigation and prosecution of his case unfolded. This argument, grounded firmly in the evidence before the jury and known to the defense throughout trial, did not violate due process as interpreted by the Second Circuit in *Agard v. Portuondo*, much less as clearly established in the decisions of the Supreme Court.

## B. *Shifting the Burden of Proof*

Evans submits that the prosecutor impermissibly shifted the burden of proof to the defense when she told the jury that the "trial is nothing less than a search for truth, and a distortion of the evidence only serves to distort the truth." Trial Trans.p. 429. By itself, the statement did not shift the burden of proof, nor was it otherwise unfair. *See generally Nix v. Whiteside*, 475 U.S. 157, 171, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) (describing trial as "a search for truth"). When it is put in context, this conclusion is only reinforced. *See United States v. Young*, 470 U.S. at 11, 105 S.Ct. 1038 (alleged prosecutorial misconduct in summation must be "viewed in context").

The challenged language came at the conclusion of an argument in which the prosecution reminded the jury how certain evidence was developed at trial. The defense had called Detective Dennis Minoque to ask about his initial interview of Tasha George. In an effort to bolster Evan's justification claim, defense counsel asked leading questions to elicit two discrete facts reported by Ms. George: (1) that "the guy being shot at moved very fast into the store" and (2) that he was "going

for" Evans. Trial Trans. pp. 183–84. The suggestion raised was that Freddy had entered the store intent on finding and harming Evans. On cross-examination, however, the prosecutor demonstrated that defense counsel's questions had been carefully framed to avoid disclosure of an important part of Ms. George's statement. Detective Minogue read the relevant section from his interview notes: "Moved very fast into store, Rocky [Evans] pulls gun, guy ducks, pulls up chairs, throwing chairs at Rocky like he was going for Rocky." *Id.* at 191.

In summation, the prosecutor discussed this evidence:

> [Defense counsel left] all of you with the impression that Tasha had told the police the guy the defendant was shooting at came into the store fast, as if he was going for Rocky.... [I]t wasn't until I questioned [the witness] that you found out that ... [t]he phrase, 'like he was going for Rocky,' modifies the throwing chairs at Rocky, which comes only after Rocky fires the gun.

> . . . . .

> Now I will concede it was a clever manipulation of the evidence ... by omitting the middle section.

> . . .

> But this trial is nothing less than a search for the truth, and a distortion of the evidence only serves to distort the truth.

*Id.* at 428–29.

This argument did not deprive petitioner of a fair trial. It did not suggest that he had any burden of proof in the case. Indeed, the court made it plain in its charge on the law that the burden of proof rested solely with the prosecution. *See, e.g.,* Trial Trans. p. 468 ("The burden remains upon the prosecution throughout. It never shifts to the defendant."); p. 485 ("[J]ustification is a defense. It doesn't have to be proven by the defendant. A lack of justification must be proven by the People beyond a reasonable doubt."). Instead, the

argument fairly commented on the evidence. Although Evans was not required to adduce any evidence at trial, once he did put before the jury part of Tasha Grant's interview statement, the prosecutor was free to comment on the extent to which the evidence presented by the defense was misleading or incomplete in relation to the facts in dispute. *See generally United States v. Myerson*, 18 F.3d 153, 163 (2d Cir.1994) (while attorneys have substantial latitude to suggest inferences to be drawn from evidence, they are not free to misstate evidence). Her submission that the misleading presentation had been a deliberate attempt to distort the truth was a hard blow but certainly not a foul one. *See Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). The record supports no other conclusion than that the defense strategy was calculated. As has long been recognized, "[a] prosecuting attorney is not an automaton whose role in summation is limited to parroting facts.... He is an advocate who is expected to prosecute diligently and vigorously, albeit without appeal to prejudice or passion." *United States v. Wilner*, 523 F.2d 68, 74 (2d Cir.1975). The prosecutor did not cross the bounds of proper advocacy in this case so as to deny petitioner a fundamentally fair trial.

## C. *Disparagement of Defense Counsel*

 Evans complains that the prosecutor improperly disparaged defense counsel in summation by referring to his "humiliation" of witnesses. In fact, it was Evans's attorney who made an issue of his own conduct during the trial. He told the jury, "please don't get the impression, ladies and gentlemen, [that] I get any perverse thrill, or enjoy humiliating witnesses when they are called to the witness stand. It's just my job." Trial Trans. pp. 363–64. This acknowledgment was offered without apology. *See id.* ("I am not ashamed of anything I have done in this courtroom").

In her summation, the prosecutor cited these statements by counsel in responding to the defense's attack on the credibility and demeanor of Tasha Grant. She acknowledged that Ms. Grant was occasionally sarcastic on cross-examination, but she suggested that the sarcasm was provoked by counsel's acknowledged attempt at witness humiliation.

> [Y]ou might recall that in the beginning of his summation, [defense counsel] said, "Look, don't get the impression I enjoy humiliating witnesses, but that is my job." Then he turns around and says look at the way she acted on the stand. If it was his job to humiliate her ... [i]t's a little unfair to turn around and say [l]ook at how she reacted on the stand.

> . . . . .

> I will concede that [answer] was sarcastic, but if you think about it, and you recall the testimony, it was a sarcastic answer to a sarcastic question. You can't fault Tasha George for being human. If she got annoyed with [counsel] and if she appeared nasty, keep in mind she was responding in kind. You can't fault her for it.

*Id.* at 422–23. In sum, the prosecutor said nothing about defense counsel that he had not said himself. Her comments were "a legitimate rejoinder" to the defense summation and did not deny Evans a fundamentally fair trial. *United States v. Millar*, 79 F.3d at 343 (finding no summation misconduct in prosecutor's reference to defendant's status as a priest where defense counsel had already cited this fact). In any event, they do not approach the level of severity required to upset a conviction. *Compare id.* at 343–44 (referring to defense as "hog wash" and accusing defense counsel of creating a "smoke screen" do not constitute serious prosecutorial misconduct warranting reversal) *with United States v. Friedman*, 909 F.2d 705, 709 (1990) (reversing conviction where prosecutor generally attacked defense bar for accepting high fees to secure acquittals for drug dealers).

**D.** *Appealing to Jury Emotions*

Similarly meritless is petitioner's claim that the prosecutor improperly appealed to the jury's emotions by noting in summation that Tondalayo Alfred did not look like a murder victim. Here again the statement must be considered in context. If that is done, it becomes apparent that the remark was not an appeal for sympathy but an attempt to challenge defense counsel's suggestion that Evans's looks were of any relevance to his guilt or innocence.

Defense counsel had asked the jury to consider "[w]hat kind of impression does he leave you, a cold blooded killer? [Y]ou think so, or one caught up in the every day existence in the streets of Brooklyn, no better or no worse than a lot of other kids." Trial Trans. p. 408. The prosecutor reminded the jurors that during voir dire they had promised "not [to] decide this case based on [Evans's] looks." *Id.* at 454. She continued to emphasize that looks were irrelevant to the roles persons might play in a crime.

> You have never seen what Tondalayo Alfred looked like.... You can be[ ] sure that when she left her house that morning, and her mother saw her for the last time ... [s]he didn't look like a victim any more than the defendant looks like a cold-blooded killer.

*Id.* at 454–55. While the reference to Ms. Alfred's mother might suggest an appeal to sympathy, the prosecutor immediately made the point of her argument clear: "I am asking you to decide this case on the evidence." *Id.* at 455.

It was entirely appropriate to urge the jury to refocus its attention on the evidence in the case. The emotional appeal of the challenged argument, if any, does not begin to compare with that at issue in *Darden v. Wainwright*, 477 U.S. at 180–81, 106 S.Ct. 2464 (*e.g.*, suggestion that defendant was an animal who should be kept on a leash; regret defendant not shot dead), which, though objectionable, was found by the Supreme Court not to have infected the trial with unfairness so as to warrant habeas relief.

In sum, the court finds that no summation comments infected Evans's trial so as to deny him the fundamental fairness guaranteed by due process.

**_Conclusion_**

For the reasons stated, the court finds that Evans has not shown that his exclusion from limited aspects of the jury selection process infringed his right to be present at material stages of his prosecution as that right has been clearly established in Supreme Court precedent. In any event, his failure to object to the procedures used by the court during jury selection waived any right he may have had to be present. The court further finds that none of Evans's myriad complaints about the court's instructions on the law or the prosecutor's summation establish a violation of clearly established principles of due process. The petition for a writ of habeas corpus is *denied.*

Because a question exists as to whether the Second Circuit's decision in *Agard v. Portuondo,* 117 F.3d 696 (2d Cir.1997), *reh'g denied,* 159 F.3d 98 (2d Cir.1998) controls this court's review of Evans's summation challenge concerning tailored testimony, the court grants a certificate of appealability on this single claim. In all other respects, a certificate of appealability is denied.

*SO ORDERED.*